**GREENLEAF CONSTRUCTION CO., INC., Plaintiff,**

v.

**UNITED STATES of America, Defendant,**

and

**Chapman Law Firm Co., Intervenor.**

**No. 05–703C.**

United States Court of Federal Claims.

Filed: Aug. 31, 2005.

Reissued: Sept. 13, 2005 [1].

Margaret A. Dillenburg, Washington, D.C., for plaintiff. Alexander Brittin and Jonathan D. Shaffer, Vienna, Virginia, of counsel.

Jeffrey S. Pease, Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., with whom are Peter D. Keisler, Assistant Attorney General, David M. Cohen, Director, and Brian M. Simkin, Assistant Director, for defendant.

James S. DelSordo, Washington, D.C., for intervenor. Laurel A. Hockey and C. Kelly Kroll, Washington, D.C., of counsel.

## OPINION

BRUGGINK, Judge.

This pre-award bid protest involves a Department of Housing and Urban Development ("HUD") procurement of management and marketing services ("M & M") for single-family housing. HUD selected the intervenor, Chapman Law Firm ("Chapman"), for award. Plaintiff, Greenleaf Construction Co., Inc. ("Greenleaf"), challenges HUD's selection and seeks injunctive and declaratory relief. We have jurisdiction under 28 U.S.C. § 1491(b)(1) (2000). Currently before us are

---

1. This opinion was first filed on August 31, 2005, under seal. The parties made minor redactions, reflected here by asterisks throughout. Also, the court has made minor editorial corrections herein. An unredacted version of the current opinion is being filed contemporaneously herewith.

cross dispositive motions pursuant to RCFC 56.1, as well as motions by defendant and intervenor to strike and motions by intervenor to supplement the Administrative Record ("record"). The record is complete, and the motions have been fully briefed. Oral argument was heard on August 29, 2005. For the reasons set out herein, we deny Greenleaf's request for relief.

## BACKGROUND

HUD, through the Federal Housing Administration ("FHA"), insures approved lenders against the risk of loss on loans for the purchase of single-family homes. When an FHA-insured loan defaults, the lender forecloses on the home and conveys it to HUD. Consequently, HUD acquires title on tens of thousands of homes a year.[2] The agency turns to contractors to manage and market the homes in its possession. HUD's current M & M procurement, which contemplated a number of contracts, including the one presently at issue, has spawned a great deal of litigation.[3]

HUD issued Request for Proposal ("RFP") Number R–OPC–22505 on August 6, 2003. Proposals were sought for the provision of:

[M & M] services to successfully monitor mortgagee compliance with the Department's property conveyance requirements, to successfully manage single family properties owned by, or in the custody of [HUD], to successfully market those single family properties which are owned by HUD, and to successfully oversee the sales closing activity, including proper accounting for HUD's sales proceeds.

Admin. R. ("AR") 6. Pursuant to the RFP, one contract was anticipated for each of twenty-four geographic areas spanning the country. These areas were grouped into four Homeownership Centers ("HOCs"). The M & M contract for the second geographic area of the Philadelphia HOC ("P–2") is at issue here.[4] HUD anticipated contract would cost the agency well over $100,000,000.

■ For each of the twenty-four contracts arising from this RFP, an offeror's eligibility to bid varied based on its size. Three contracts were set aside exclusively for small business concerns; another contract was similarly reserved for Section 8(a) business concerns. Three other contracts were subject to full and open competition between offerors of all types. The remaining seventeen contracts were subject to "Cascade Procedures." Typically, offerors of any size are free to bid on a cascading procurement, but particular tiers of offerors are given preference over others. If the competition among bidders in a preferred tier is inadequate, the procurement will cascade into the next prescribed tier of bidders. Three contracts were classified as "Cascade from 8(a) to Small Business to Unrestricted;" all others, including the contract at issue, were classified as "Cascade from Small Business to Unrestricted."

According to RFP ¶ M.9.1.b.i, a small-business-to-unrestricted cascade mandates contract award to a small business provided that the competition in the small business tier is adequate:

Awards will be made on a competitive basis first to an eligible small business concern provided there is adequate competition among such firms. When there is inadequate competition among small business concerns, an otherwise qualified offer will be considered with all offers from all responsible business concerns and award will be on the full and open competition considering all offers submitted by all responsible business concerns.

AR 268. Paragraph M.9.1.b.iii further states that adequate competition exists if "[a]t least

**2.** Due to the FHA-insured loan program, HUD is the largest real estate seller in the country. The agency sold 63,000 single-family homes in fiscal year 2002.

**3.** *See Chapman Law Firm Co. v. United States,* 67 Fed.Cl. 188 (2005); *Chapman Law Firm Co. v. United States,* 65 Fed.Cl. 422 (2005); *Orca N.W. Real Estate Servs. v. United States,* 65 Fed.Cl. 419 (2005); *Orca N.W. Real Estate Servs. v. United*

*States,* 65 Fed.Cl. 1 (2005); *Portfolio Disposition Mgmt. Group LLC v. United States,* 64 Fed.Cl. 1 (2005); *Chapman Law Firm v. United States,* 63 Fed.Cl. 519 (2005); *Chapman Law Firm v. United States,* 63 Fed.Cl. 25 (2004); *Chapman Law Firm Co. v. United States,* 62 Fed.Cl. 464 (2004).

**4.** P–2 encompasses Michigan and Ohio.

two competitive offers are received from qualified responsible business concerns at the tier under consideration; and award will be made at fair market prices as determined in accordance with [Federal Acquisition Regulation] 19.202–6." AR 269.

The RFP required offerors to submit proposals in two parts: a Technical and Management Proposal ("Technical Proposal") and a Business Proposal, which concerned pricing.[5] Because offerors were bidding on a "best value" procurement, a proposal's technical aspects were "significantly more important" than its pricing. AR 263. HUD tasked a Technical Evaluation Panel ("TEP") with the evaluation of each M & M bid pursuant to these criteria.

By April 2004 at least ten offerors had submitted proposals for the P–2 contract. Nine of these offerors, including Greenleaf, Chapman, and * * *, were self-certified as small businesses. At some point in early 2004, the TEP evaluated and ranked the technical proposals in the small business tier. It concluded that Greenleaf's proposal was superior to all others and recommended that it be included in the competitive range for award. It also recommended the proposals of * * * and Chapman, which were ranked second and third respectively, for the competitive range.[6] In the Competitive Range Determination dated April 26, 2004, Ms. Brenda Thomas, the Contracting Officer ("CO"), examined the technical and cost aspects of each proposal. She concluded that the prices offered by the three highest-ranked bidders were fair, competitive, and ensured the likelihood that the ultimate P–2 contract would have a fair market price. Therefore, she concurred with the TEP's rec-

ommendations and established a competitive range containing Greenleaf, * * *, and Chapman.

In the internal Pre–Negotiation memorandum also dated April 26, 2004, Ms. Thomas noted that "[o]nly the small business tier was opened" for initial consideration and concluded that "[a]dequate competition exists [in that tier] in accordance with the Federal Acquisition Regulation." AR 959. In support of her conclusion, she cited the TEP's recommendation of three offerors for the competitive range.

By establishing the competitive range, HUD had "eliminated from the competition" the six lowest-ranked small business offerors. See Federal Acquisition Regulation ("FAR") 15.503(a)(1) (2004). Thus, HUD had identified the three bidders it expected could qualify for the contract's eventual award. Pursuant to procedures outlined in the CO's Source Selection Determination, each offeror in the competitive range was afforded the opportunity to engage the agency in written discussions. Accordingly, Ms. Thomas issued discussion letters, tailored to each offeror, that outlined the weaknesses and significant weaknesses perceived by the TEP in each offeror's technical proposal. In an effort to respond to these concerns, each offeror submitted a Final Proposal Revision ("FPR") by early May 2004.

On June 9, 2004, Ms. Thomas signed an internal Price Negotiation Memorandum, which discussed revised cost estimates contained in each competitive offeror's FPR. Greenleaf's estimate of $* * * was $* * * less than * * *'s estimate, $* * * less than Chapman's estimate, and $* * * less than

---

**5.** The government used the following six factors, in descending order of importance, to evaluate technical proposals: (1) Management Capability and Quality of Proposed Management Plan; (2) Past Performance; (3) Prior Experience; (4) Proposed Key Personnel; (5) Subcontract Management; and (6) Small Business Subcontracting Participation.

**6.** The Initial TEP Report appears at AR 863. This document, dated April 22, 2004, contained the following ratings for the three best technical proposals: Greenleaf, * * * with * * *; * * *, * * * with * * *; and Chapman, * * * with * * *. In her Competitive Range Determination

of April 26, 2004, Ms. Thomas references an "Initial TEP Report" dated February 20, 2004. This report does not appear in the record. According to ratings referenced in the CO's range determination, the February and April reports reached the same conclusion for most, but not all, of the nine small business offerors.

The court lacks any basis for determining whether the TEP issued more than one initial report for the small business tier. For the purposes of this case, we concern ourselves only with the contents of the report contained in the record. The confusion in the record has no bearing on our analysis.

the Independent Government Cost Estimate for the procurement. Based on this pricing, Ms. Thomas confirmed her earlier conclusion concerning the competitiveness of the small business tier. She found "that adequate competition exists, [and that] all pricing is considered to be fair and reasonable ...." AR 1938.

On June 12, 2004, the TEP issued its final report, which accounted for the proposal changes contained in each offeror's FPR. In the report, the TEP increased Greenleaf's rating from * * * to * * *. The ratings of * * * and Chapman remained unchanged. Because, in the panel's estimation, Greenleaf was "clearly the most technically qualified" and offered the lowest price, the TEP recommended it for award. Consequently, on July 6, 2004, the Source Selection Official, Mr. Engram Lloyd, Director of the Philadelphia HOC, selected Greenleaf for award. Pursuant to ¶ L.16.b of the RFP, the award could not be formalized with an executed contract until the CO determined Greenleaf responsible pursuant to the criteria enumerated in FAR 9.104–1. Ms. Thomas rendered a responsibility determination for Greenleaf in a report signed on July 30, 2004.

Before Greenleaf was determined responsible, however, Chapman challenged the intended award by filing a size protest with HUD. Chapman argued that Greenleaf did not warrant the award because it exceeded the size limitations necessary to compete in the small business tier. HUD forwarded the size protest to the Small Business Administration ("SBA") for a determination. On July 30, 2004, the SBA determined Greenleaf to be other than small for purposes of the P–2 procurement.

As a result of the SBA size determination, HUD disqualified Greenleaf from the small business tier and re-opened negotiations with the remaining offerors in the competitive range: Chapman and * * *. In the fall of 2004, HUD engaged both offerors in an additional round of written discussions, which resulted in the submission of revised FPRs. Based on an evaluation of * * * 's newest FPR, the TEP amended its Final TEP Report. During the time following the Final TEP Report, which was issued in June 2004, HUD had awarded * * * four geographically disparate M & M contracts. Pursuant to a re-evaluation of the first technical proposal evaluation factor, Management Capability and Quality of Proposed Management Plan, the TEP concluded in its amended report that * * * had the capacity to perform only four M & M contracts. It reasoned that the award of a fifth contract would pose "an unacceptably high risk of unsuccessful performance." AR 2535. Because of this risk, the TEP deemed * * * "technically non-competitive ...." AR 2543. In light of * * * 's technical uncompetitiveness and Greenleaf's disqualification, the TEP concluded that Chapman, alone, could not maintain adequate competition in the small business tier and recommended cascading the P–2 procurement to the unrestricted tier.

Ms. Thomas concurred with the TEP's recommendation and cascaded the procurement. Chapman advanced to the unrestricted tier pursuant to the cascade procedure contained in RFP section M.9. Greenleaf became re-eligible to compete in the expanded competition because the invalidation of its original size certification had no impact on the validity of its proposal. Finally, a large business ("unnamed offeror"), the only one to have submitted a bid when offers were first solicited, was now able to compete in the new tier.[7] Based on the recommendations found in the Initial TEP Report for the unrestricted tier[8] and her own evaluation of the offerors' proposals, Ms. Thomas placed Chapman, Greenleaf, and the unnamed offeror in the

---

7. This offeror's name was redacted from the record.

8. The TEP ranked Greenleaf's technical proposal * * * with * * *. It raised Chapman's previous rating from * * * to * * * with * * *. The unnamed offeror received the same ratings as Chapman. According to an attached memorandum signed by Ms. Thomas, this report was completed on January 6, 2005. It was later discovered that the report mistakenly had not been signed or placed in the contract file. Therefore, the report is dated March 15, 2005, almost two months after it served as a basis for establishing the competitive range for the unrestricted tier.

tier's competitive range.[9]

Although HUD had already cascaded to the unrestricted tier, in February 2005 Ms. Thomas determined that a recent Comptroller General procurement decision, *Capitol CREAG LLC*, 2005 Comp. Gen. ¶ 31 (2005), entitled * * * to the reconsideration of its capacity, which had served as the basis for HUD finding it technically uncompetitive. According to the CO, the Comptroller's opinion "indicated that an agency's decision to find a small business nonresponsible based on capacity issues should be referred to the SBA for a Certificate of Competency [("COC")]." AR 3863. The COC procedure gives the SBA the final word when a procuring agency calls into doubt the responsibility of a small business that is otherwise in line for award. *See* FAR 9.103(b), 19.602–3(b)(2). If the SBA approves the COC application of a bidder referred by a procuring agency, the CO must award that bidder the contract. *Id.* 19.602–4(b).

In light of the Comptroller's decision, Ms. Thomas afforded * * * the opportunity to seek a COC from the SBA to test the agency's decision to cascade.[10] On March, 4, 2005, Ms. Thomas issued a nonresponsibility determination based on her perception that * * * lacked the capacity and capability to perform the P–2 contract and referred the offeror to the SBA. Before the SBA could act on its COC application, however, * * * withdrew from the P–2 procurement. As a result, HUD no longer regarded the propriety of the cascade as being in question.

After HUD engaged the three competitive range offerors in a round of discussion and FPR submissions, the CO wrote an internal Price Negotiation Memorandum for the unrestricted tier. In this memo, she concluded that Greenleaf's estimated price of $* * * was $* * * less than its original small business tier estimate, $* * * less than Chapman's revised estimate, and $* * * less than the Independent Government Cost Estimate for the procurement. The estimate of the unnamed offeror was the costliest among the competitive offerors. On April 11, 2005, the TEP signed its Final TEP Report for the unrestricted tier. In it, Chapman's rating improved from * * * to * * * and its risk assessment was improved from * * * to * * *. Although the TEP ranked Chapman's technical proposal ahead of the unnamed offeror's proposal, it concluded that Greenleaf's technical proposal maintained marginal superiority. Greenleaf's technical superiority, coupled with its much lower cost estimate, prompted the TEP to recommend its bid for award.

In April 2005 Ms. Thomas once again determined Greenleaf responsible, the source selection official selected Greenleaf for award, and Greenleaf entered into the P–2 contract with HUD. Chapman filed a protest of this award with the Government Accountability Office ("GAO") on May 2, 2005. Chapman argued that the agency's decision to cascade the procurement to the unrestricted tier, which had exposed its own bid to competition with the eventual winner, was inappropriate. As part of this protest, the GAO requested the SBA to "provide its views on the merits" of Chapman's case. AR 3773.

The SBA concurred with Chapman's argument in a June 2, 2005, letter addressed to the GAO. The letter was signed by John W. Klein, Associate General Counsel for Procurement Law, and Kenneth Dodds, of the SBA Office of General Counsel. In it, the SBA characterized Chapman's protest as a

9. The record contains a number of inconsistencies. *See supra* notes 6 & 8. In particular, the January 3, 2005, Competitive Range Determination cites for support the January 11, 2005, Initial TEP Report for the unrestricted tier. *See supra* note 8. The Competitive Range Determination also relies upon the Determinations and Findings of January 6, 2005. In turn, the January 6 document is premised on the January 11, 2005, Amendment to Final TEP Report for the small business tier. None of the parties have taken issue with the date discrepancies contained within the record. Thus, we assume that all

documents were preceded in existence by the documents upon which they rely, regardless of a date conflict. For the sake of our analysis, however, we treat each document date as accurate.

10. Presumably, the CO concluded *Capitol CREAG* was applicable because * * *'s lack of capacity, which had formed the basis for HUD finding the offeror technically uncompetitive, also would have related to an evaluation of the offeror's responsibility pursuant to FAR 9.104–1 if it had been selected for award.

challenge to the timing of HUD's "determination of whether adequate competition exists in a given tier . . . ." AR 3782. The SBA also treated the cascade procedure as a subset of small business set asides. The SBA concluded that regulations governing small business set asides governed cascading procurements as well.

According to the set-aside regulation known as the "Rule of Two," a CO shall set aside for small businesses any procurement greater than $100,000 if the CO has a "reasonable expectation" that "two responsible small business" offerors will submit bids that will result in an award "at fair market prices." FAR 19.502–2(b). In other words, the evaluation of competition adequacy for a small business set aside is prospective. Based on this rule, the SBA determined that a procuring agency's "set-aside determination is usually made before the solicitation is issued." AR 3783. With regard to the procurement at issue, the SBA concluded that HUD's initial decision to not cascade—or, from the SBA's perspective, its decision to set aside—occurred when the agency established the competitive range. To support this conclusion, it quoted RFP section H.14: " 'Whenever there is adequate competition (two or more competitive technical and cost Offerors) at a tier, an award is made.' " *Id.* The SBA reasoned that HUD's identification in April 2004 of a competitive range containing three self-certified small business offerors warranted its decision to set the procurement aside at that time.

According to the SBA, subsequent events that reduced to one the number of small business offerors should not have drawn into question the prior determination that there was adequate competition. It claimed that "it is well settled that a contracting officer may make an award under a small business set-aside even if only one offer is actually received." *Id.* It also pointed out that, in the set-aside context when an otherwise successful bidder is determined to violate the relevant size standard, "award can and should be made to the next best, eligible offeror, even if there is only one remaining eligible offeror." [11] *Id.* Therefore, the SBA opined that HUD improperly cascaded to the unrestricted tier and that Chapman should have received the award in the small business tier. Soon after the SBA issued this letter, HUD took corrective action by terminating for convenience its contract with Greenleaf on June 17, 2005.[12] At the same time, it selected Chapman for award of the P–2 contract, thereby setting the stage for the current protest. As of the date of oral argument, Chapman had not executed a contract with HUD.

Plaintiff filed its complaint seeking injunctive and declaratory relief on June 20, 2005. HUD agreed to withhold executing the P–2 contract until no earlier than August 31, 2005. Soon after its motion to intervene was granted, Chapman filed a motion to dismiss for failure to state a claim and for expedited consideration on July 8, 2005. Defendant filed the Administrative Record, a redacted copy of HUD's P–2 procurement file, on July 13, 2005.

Plaintiff filed its Motion for Judgment on the Administrative Record Pursuant to Rule 56.1(b)(1) and Preliminary Injunction Pursuant to Rule 65 on July 29, 2005. In support, plaintiff submitted one affidavit and three declarations that do not appear in the record below. This evidence purportedly bears on whether the intervenor is responsible and whether it suffers from an unmitigated conflict of interest. In response, defendant

---

**11.** The SBA letter has some obvious shortcomings. For example, the SBA supported the first conclusion with subsection (a) of the Rule of Two despite the fact that subsection (a) applies to procurements with an anticipated dollar value between $2,500 and $100,000. Subsection (b), which governs more costly acquisitions, contains no such express direction. Furthermore, the Comptroller decisions cited by the SBA for additional support examined a version of the Rule of Two that is materially different from the regulation currently in force.

The SBA supported its second conclusion with 13 C.F.R. §§ 121.1009(g)(1) and (2). Although this regulation addresses the procedure for determining a business' size, it does not speak to the proposition for which it was cited.

**12.** At the same time, HUD awarded a four-month bridge contract to Michaelson, Connor and Boul, Inc., the incumbent contractor for the P–2 area. *See Chapman,* 2005 U.S. Claims LEXIS 242.

cross-moved for judgment on the record and moved to strike plaintiff's evidentiary submissions. Intervenor cross-moved for judgment on the record and to strike plaintiff's evidentiary submissions. Intervenor also filed two alternative motions to supplement the record with a letter and two declarations, which intervenor claims are necessary to rebut arguments raised by plaintiff.

## DISCUSSION

Greenleaf seeks to have HUD award it the P–2 contract or, in the alternative, to have HUD re-solicit the procurement. We may grant Greenleaf relief only if HUD's award decision was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. 5 U.S.C. § 706(2)(A) (2000); *see* 28 U.S.C. § 1491(b)(4); *PGBA, LLC v. United States*, 389 F.3d 1219, 1228 (Fed.Cir.2004); *Southfork Sys., Inc. v. United States*, 141 F.3d 1124, 1132 (Fed.Cir.1998).

Even if it is demonstrated that the procurement was subject to a procedural violation by the agency, Greenleaf must prove that the violation was prejudicial. *See Galen Med. Assocs., Inc. v. United States*, 369 F.3d 1324, 1330 (Fed.Cir.2004). Furthermore, Greenleaf must prove that, but for the alleged error, it would have had a "substantial chance" of winning the contract. *Banknote Corp. of Am., Inc. v. United States*, 365 F.3d 1345, 1351 (Fed.Cir.2004); *Emery Worldwide Airlines, Inc. v. United States*, 264 F.3d 1071, 1086 (Fed.Cir.2001).

### I. The Cascade Procedure

The heart of this dispute concerns HUD's application of the cascade procedure. At the outset, we note that the cascade procedure has developed without the discipline of regulatory guidance.[13] Indeed, the procedure has been criticized. *See generally* Vernon J. Edwards, *Cascading Set–Asides: A Legal and Fair Procedure?*, 19 Nash & Cibinic Report 117 (2005) (summarizing and expounding legal and policy criticisms of the cascade procedure).

Two justifications for cascading procurements have been posited: first, the procedure saves agencies the trouble of resolicitation when a set-aside procurement fails to result in a contract award, *see, e.g., Carriage Abstract, Inc.*, 2002 Comp. Gen. ¶ 148 (2002); *The Urban Group, Inc.*, 99–1 Comp. Gen. ¶ 25 (1999); and second, the procedure favors small businesses in procurements that otherwise would not have been set aside for their benefit, *Urban Group*, 99–1 Comp. Gen. ¶ 25. While the justifications for cascading may be legitimate, they cannot lead to a procedure that violates acquisition regulations. To the extent that the RFP calls for a process inconsistent with those regulations, the regulations will control the outcome.

The RFP states that a procurement should not be cascaded to the unrestricted tier if there is "adequate competition" among small business offerors. The parties dispute both the substance and timing of the HUD's evaluation of adequate competition. According to Greenleaf, the terms of the RFP require HUD to conclusively evaluate the responsibility of each small business offeror pursuant to FAR Subpart 9.1 before it determines whether competition is adequate. Greenleaf claims that, in the present case, HUD properly applied the cascade procedure by withholding its conclusive evaluation of competition adequacy until after it had examined the responsibility of the small business offerors before it. Thus, it concludes, the agency's subsequent decision to reverse the cascade violated the RFP and deprived Greenleaf of its award.

The government and Chapman argue that, as laid out in the RFP, the responsibility of small business offerors is not relevant to the evaluation of adequate competition. According to both parties' reading of the RFP, the adequacy of competition is determined once, at the time bids are initially submitted, independent of the subsequent evaluation of the putative awardee's responsibility. Chapman also points out that, despite HUD's later decision to cascade, the agency initially decided that the small business tier was ade-

---

**13.** Greenleaf did not challenge the use of the cascade procedure at the time the solicitation was issued.

quately competitive shortly after the receipt of bids. Thus, the government and Chapman conclude that HUD correctly reversed its decision to cascade.[14]

Part of the problem here is that the RFP is less than clear. RFP section H.14, which enumerates special contract requirements, defines adequate competition in a tier as "two or more competitive technical and cost Offerors." AR 123. If that was all the RFP said about the adequacy of competition, Greenleaf's protest would have no force. According, however, to ¶ 9.1.b.iii of RFP section M, which details award procedures, adequate competition exists when "[a]t least two competitive offers are received *from qualified responsible business concerns* at the tier under consideration; and award will be made at fair market prices as determined in accordance with FAR 19.202–6." AR 269 (emphasis added). Greenleaf bases its argument on the word "responsible" in the second definition. It links the use of that word to the FAR's elaborate regime for determining responsibility. It reasons that HUD inserted the word because it intended to postpone the conclusive consideration of adequate competition until late in the award process. As counsel explained at oral argument, the question of adequate competition should be an ongoing concern because preliminary assessments may be overtaken by events unique to particular bidders, as happened here to * * *. According to Greenleaf, the very fact that * * * received other awards through the M & M procurement, thereby reducing its capacity to perform a fifth contract, meant that there was inadequate competition in the P–2 procurement.

Because the RFP does not define "qualified responsible business concerns,"

Greenleaf looks to the FAR for guidance. Pursuant to FAR Subpart 9.1, a CO must affirmatively determine a bidder responsible before that bidder is awarded a contract. FAR 9.103(a), (b). A responsible contractor is one determined to have: adequate financial resources; the ability to meet the contract schedule; a satisfactory record of performance, integrity, and business ethics; the necessary experience, skill, equipment, and facilities; the qualifications for award under all other applicable laws and regulations. *Id.* 9.104–1. A bidder that fails to meet the responsibility criteria will be determined nonresponsible. *Id.* 9.103(b).

In effect, Greenleaf reasons that HUD must examine the responsibility of enough small business offerors to determine if at least two are responsible. Furthermore, it claims that these multiple determinations must precede the selection of a putative awardee in order to ensure competition adequacy at the time of award. At oral argument, counsel argued that HUD intended such a process when it drafted the RFP because many small business offerors were expected to compete for multiple awards under this procurement. According to Greenleaf, the award of one contract could significantly decrease a bidder's capacity to perform other contracts because the contracts subject to this procurement were relatively large. Therefore, Greenleaf contends that the agency anticipated that, over the course of the procurement, bidders could be rendered nonresponsible for lack of capacity by winning the award of other M & M contracts.[15]

---

**14.** In its letter to the GAO, the SBA interpreted the RFP in a manner that supports the outcome now urged by the government and Chapman. Neither the government nor Chapman urge us to lend the SBA letter dispositive weight. We agree. The letter is no better than the quality of its analysis, about which we have reservations. *See, e.g., supra* notes 11, infra note 19. We merely note that the SBA helped HUD draft the RFP cascade provisions that are now subject to conflicting interpretations, that it is the agency responsive to matters of small business, and that it now takes a position that supports the arguments against relief. Had the SBA adopted the

opposite position, we might be inclined to give more serious attention to its views.

**15.** Greenleaf was unable to point to record evidence in support of its contention that HUD purposely sought to award large M & M contracts to small businesses, thereby necessitating increased vigilance in gauging bidder responsibility. It is clear, however, that the contracts subject to this procurement were valued at tens of millions of dollars and that some small business offerors sought the award of more than one contract.

Greenleaf argues that HUD arrived at its January 6, 2005, decision to cascade after conducting the necessary evaluation of responsibility among bidders in the small business tier. Furthermore, Greenleaf claims the agency's later reversal was improper because Chapman, which had become the lone offeror at that point, did not provide adequate competition. Were Greenleaf's argument credited, prejudice would be established because the decision to reverse the cascade also stripped Greenleaf of the contract award.

On its face, the RFP's second definition of adequate competition is amenable to Greenleaf's interpretation.[16] Greenleaf's construction, however, is incompatible with other RFP provisions, with the overall responsibility determination regime established by the FAR, and with the agency's actions here.

The RFP provisions that obligate HUD to render a FAR 9.104 responsibility determination contradict Greenleaf's interpretation. In section L.5, the RFP directs *the award* of M & M contracts to "the Offerors who are deemed responsible in accordance with the [FAR], as supplemented . . . ." AR 258. In ¶ L.16.b, the agency is directed to make "a responsibility determination . . . prior to award pursuant to FAR 9.104–1." AR 262. And in section M.8, the RFP directs the agency to award the contract "to the Offeror that is deemed responsible in accordance with FAR 9.104 . . . ." AR 267. These provisions plainly contemplate only one determination of bidder responsibility—that of the eventual awardee. An overall reading of the RFP therefore does not suggest the examination of any other bidder's responsibility pursuant to FAR Subpart 9.1. By contrast, Greenleaf's interpretation of the second definition would require HUD to render a number of on-going responsibility and nonresponsibility determinations sufficient to conclude that two bidders in the small business tier remain responsible at the time of award.

Further, the word "responsible" in the second definition lacks either an explicit reference to FAR 9.104, unlike sections L.16 and M.8, or the general reference to the FAR contained in section L.5. Sections L.5, L.16, and M.8 demonstrate that, when HUD intended to denote a FAR 9.104 responsibility determination in an RFP provision, it explicitly referenced the FAR. In contrast, the cover letter to the procurement illustrates the agency's intent when it employed the word "responsible" without reference to the FAR. The letter contained the following phrase: "All responsible offerors will be eligible to submit proposals." AR 1. Clearly, the agency did not intend to limit the pool of offerors to those already determined responsible pursuant to FAR 9.104—it is impossible to perform such a determination prior to bid submission. Instead, the provision indicates to potential offerors that they must be capable of surviving a future responsibility determination.

It appears then, that when the agency expected the CO to actually render a FAR 9.104 responsibility determination, the RFP provision specifically discussed FAR subpart 9.1, or at least referenced it. It is thus implausible to read into a provision lacking a similar explicit reference an implied duty to render a potentially continuing series of such determinations. The agency could have bound the CO and offerors to such a procedure, but without a clearer indication in the procurement that such a process was contemplated, we will not assume it was intended.

Greenleaf's claim that numerous pre-award responsibility determinations are necessitated by the unique nature of this procurement is also blunted by provisions in the RFP. As a general matter, a bidder selected for award must be determined responsible before a contract is executed. Prior to that point, however, section K.5 of the RFP requires offerors to certify their eligibility for award with respect to responsibility issues such as debarment and suspension. This certifica-

---

16. Unlike the second definition, the first definition omits any reference to the word "responsible." Greenleaf argues that the definitions are not contradictory because the first definition explicitly incorporates by reference the second defi-

nition and its responsibility term. Although the first definition references section M.8, the second definition is found in section M.9. Thus, the contradiction between the two is not resolved.

tion is made at the time of bid submission, but it provides the agency with a basis for conclusively evaluating responsibility in the future. Much as bidders are asked to self-certify their size eligibility, the RFP appears to rely on bidders assessing their own ability to pass a responsibility test. The use of the term "responsible" at ¶ M.9.1.b.iii, therefore, is not surprising and hardly a basis for inserting a procedure that runs counter to the general operation of FAR Subpart 9.1.

■ In FAR Subpart 9.1, a CO is required to make a responsibility determination only for the one bidder selected for award. FAR 9.103(a), (b). Contrary to Greenleaf's argument, the FAR does not require procuring agencies to conclusively evaluate the responsibility of other bidders. *See* John Cibinic, Jr. & Ralph C. Nash, Jr., *Formation of Government Contracts* 404–06 (3d ed.1998). In fact, contract execution is the only means to formalize a CO's responsibility determination. FAR 9.105–2(a)(1), (b). Thus, even if an agency evaluated more than one bidder's potential responsibility, only one determination could be formalized under the FAR.

Greenleaf argues that the best evidence that HUD agreed with plaintiff's interpretation of the RFP is that the agency decided to cascade. Greenleaf points out that, before HUD decided that Chapman, alone, could not provide adequate competition, the agency had conclusively evaluated the responsibility of both Greenleaf and * * *. From this, Greenleaf argues that Ms. Thomas interpreted the RFP as obligating her to determine whether at least two small business offerors were responsible pursuant to FAR 9.104 before she could cascade to the unrestricted tier.

While it is correct that Ms. Thomas felt the presence of only one small business as of January 2005 prompted a need to cascade, our review of the record suggests that this decision did not result from an application of the procedure proposed by Greenleaf. There is no evidence that HUD read the RFP to mandate conclusive responsibility evaluations prior to assessing the adequacy of competition. If it had shared Greenleaf's interpretation, it seems reasonable the agency would have concurrently evaluated the responsibili-

ty of Greenleaf and * * *, the two highest-rated offerors in the competitive range. Instead, the agency evaluated * * * *'s responsibility more than seven months after it determined Greenleaf responsible.

In the Pre–Negotiation Memorandum dated April 26, 2004, Ms. Thomas had already concluded that "[a]dequate competition exists in accordance with the [FAR]." AR 959. Ms. Thomas confirmed this finding in the June 9, 2004, Price Negotiation Memorandum. AR 1938 ("... the [CO] finds that adequate competition exists ...."). Both of these references to the CO's conclusive evaluation of competitiveness predate Ms. Thomas' July 30, 2004, responsibility determination for Greenleaf. Furthermore, by applying the typical responsibility process, HUD selected Greenleaf for award before it determined Greenleaf responsible. Clearly, HUD was not evaluating the adequacy of competition at a time when it had already determined the competition's winner. What is apparent is that, as of July 6, 2004, when Greenleaf was initially selected for award, Ms. Thomas had already decided that there was adequate competition in the small business tier, and yet there had been no conclusive responsibility evaluation as to any offeror.

Greenleaf also cites * * * *'s nonresponsibility determination as proof that the RFP mandates responsibility determinations before HUD can cascade to the unrestricted tier. This argument, however, ignores the chronology. At the time Ms. Thomas signed the nonresponsibility determination, the procurement had already cascaded to the unrestricted tier because, previously, * * * had been determined uncompetitive on technical grounds. The Comptroller's decision in *Capitol CREAG*, which was issued subsequent to the cascade decision, prompted Ms. Thomas to offer * * * the opportunity to seek the SBA's opinion on its capacity. In order to enable that second opinion, * * * later was determined nonresponsible for lack of capacity, the same reason it had previously been determined technically uncompetitive. Once Ms. Thomas determined * * * nonresponsible, she referred the offeror to the SBA for a potential COC. The small-business COC exception to the responsibility determination

regime, not an impending decision to cascade, prompted the examination of * * * 's responsibility. If * * * 's technical proposal had been competitive, its responsibility would have been reviewed by the agency only if it had been selected for award.

We therefore conclude that Greenleaf's interpretation of ¶ M.9.1.b.iii is unsupported. By reaching this conclusion, however, we have not read "responsible" out of the definition of adequate competition. As Greenleaf correctly points out, every term in the RFP must be given effect.[17] In our effort to provide such effect, we must be mindful to interpret the solicitation " 'as a whole' in order to 'effectuate its spirit and purpose,' " *Input/Output Tech. v. United States,* 44 Fed. Cl. 65, 70 (1999), "in a manner that harmonizes and gives reasonable meaning to all of its provisions," *Banknote Corp. of Am. v. United States,* 365 F.3d 1345, 1353 (Fed.Cir. 2004).

Because the FAR establishes the definition of "responsible," we are left to determine what the agency intended by use of the word. As we held above, the FAR neither mandates nor contemplates that a CO will determine more than one bidder responsible for any given award. We believe the only reasonable interpretation of the RFP, as a whole, is that a prospective element must be implied in the definition of adequate competition. A CO's evaluation of adequate competition thus means she must assess the likelihood, based on bid proposals, that an adequate pool of small business offerors exists.

Implying an element of conditionality is supported by section M.9, which, as Chapman points out, states that adequate competition exists when " 'at least two competitive offers are *received.*' " Intervenor's Opp'n 10 (emphasis in original). Chapman reasons that a CO should take a conclusive look at the adequacy of small business tier competition when the competitive range is established, as appears to have happened here.[18] If HUD did not intend the receipt of bids and the evaluation of competitiveness to be nearly contemporaneous events, then the agency would not have defined adequate competition within the context of bid receipt.

A comparison of the RFP term at issue with the "Rule of Two" also supports the idea that the term "responsible" was intended to refer to future application of FAR Subpart 9.1. According to the Rule of Two, a decision to set a procurement aside is prospective in nature: "The [CO] shall set aside any acquisition over $100,000 for small business participation when there is a *reasonable expectation* that (1) offers will be obtained from at least two responsible small business concerns...; and (2) award will be made at fair market prices." FAR 19.502–2(b) (emphasis added). Although the Rule of Two does not govern cascading procurements,[19] its terms impact which procurements are issued subject to cascade procedures. By definition, a cascading procurement is one in which the

---

**17.** Chapman proffers an interpretation of adequate competition that fails this rule of construction. *See infra* note 18.

**18.** We note that Chapman denies that bidder responsibility is relevant to a CO's evaluation of competition adequacy. It misquotes the RFP, however, by placing a period, rather than an ellipsis, after the word "received." Doing so erroneously implies that a competition-evaluating CO is only concerned with the number of "competitive offers," not also the "qualified responsible" nature of the bidders or the likelihood that "award will be made at fair market prices ...." AR 269. Therefore, when standing alone, Chapman's argument does not offer a reasonable interpretation of the RFP.

Chapman attempts to buttress its reading with *Carriage Abstract,* 2002 Comp. Gen. ¶ 148. That decision, however, concerned an RFP provision that lacked any reference to bidder responsibility or fair market prices. Furthermore, the decision does not detail when the CO had determined adequate competition.

Despite these weaknesses, however, Chapman's argument provides a reasonable interpretation of the word "received" that has a direct bearing on the timing of the evaluation of adequate competition.

**19.** In contrast to the SBA's conclusion that "all FAR provisions applicable to small business setasides must be followed when a procuring agency utilizes the cascading set-aside methodology," AR 3784, we do not simply apply the Rule of Two to the matters at hand. The Rule only governs whether a procurement will be issued as a small business set aside. It has no impact on issued solicitations. *See id.* (directing the set aside of a large procurement if the CO reasonably expects that "offers *will be* obtained ....") (emphasis added).

CO lacks a reasonable expectation of bids from at least two responsible small businesses. Otherwise, the Rule would mandate that such a procurement be set aside for small business.

The similarities between the Rule of Two and the definition of adequate competition are obvious. They share nearly every material provision. That the Rule operates prospectively is explicit: a CO shall set aside a procurement if he has a "reasonable expectation" of responsible bidders and fair market prices. *Id.* The logic behind the Rule is obvious—it may not be possible for a CO to gauge bidder responsibility and price fairness before a solicitation is even issued. It is not unreasonable to assume that a cascading procurement should operate in a similar way, namely based on an assumption at the outset that bidders have appropriately self-certified both their small size and that they are responsible.

We are not persuaded by the government's alternative interpretations of the second definition of adequate competition. In one argument, the government claims that "responsible" should be given its plain dictionary meaning. As such, a CO need not demand more from a potential small business awardee than a parent demands from a growing child—"a general level of responsibility." Def.'s Opp'n 15 (citing American Heritage Dictionary of the English Language (4th ed.2000)). In another argument, the government attempts to distill from the RFP two responsibility determinations. The first, which is employed in sections L. 16 and M.8, is a "formal responsibility determination" as prescribed by FAR 9.104. *Id.* 14–15. The second, which the government claims includes the type of responsibility at issue here, is a general, informal responsibility determination that simply requires an offeror to submit financial statements during discussions with the agency.

The government's effort to lend the word "responsible" a reasonable meaning misses the mark. There is only one regulatory regime established in FAR Subpart 9.1 for addressing responsibility. As discussed above, FAR 9.104–1 establishes the seven factors by which a bidder's responsibility is judged. FAR 9.104–2 gives procuring agencies the authority to create additional responsibility evaluation factors in prescribed situations. The other sections of Subpart 9.1 elaborate on the purpose, scope, and application of these standards. In light of this in-depth regulatory regime, the government's effort to craft dual meanings for the word "responsible," as well as its reliance on the dictionary, are unconvincing.

■ In sum, the alternative scenario proposed by Greenleaf runs counter to the normal timing of responsibility determinations, runs counter to the agency's application of the RFP in this case, and would lead to the anomalous result that a determination of adequate competition must be revisited over time to account for the vagaries of a bidders' circumstances. We therefore conclude that reversal of the decision to cascade was correct. The adequacy of competition at the small business tier had been sufficiently addressed. The fact that * * * withdrew, leaving Chapman as the lone small business offeror, did not compel a cascade to the unrestricted tier. While Greenleaf has established prejudice, it fails on the merits of its argument that the agency violated the terms of the RFP.

## II. Greenleaf's Responsibility and Conflict of Interest Challenges

In its motion for judgment, Greenleaf argued that Chapman did not warrant award because it could not be found responsible and because it was subject to an unmitigated conflict of interest. In support of these arguments, Greenleaf submitted an affidavit and three declarations. At oral argument, Greenleaf conceded that, given the fact that HUD has not yet made a responsibility determination as to Chapman, there is no agency action to evaluate. These arguments are thus premature. It reserves the right to raise either argument at a future date in the event these issues become ripe for review. We therefore grant the motions to strike of both the government and Chapman. We also deny as moot Chapman's alternative motions to supplement the record with rebutting evidence.

**362**

III. Government's Motion to Dismiss Counts IV and V for Lack of Standing

In support of its motion to dismiss Counts IV and V of Greenleaf's complaint, the government argues that Greenleaf lacks standing. In order to demonstrate Chapman's ineligibility for award, Greenleaf assumes in both counts, for the sake of argument, that various defenses raised by the government and Chapman are correct. Under Count IV, Greenleaf assumes that the SBA properly criticized HUD's decision to cascade. In Count V, Greenleaf assumes that it would have been appropriate for the agency to have conclusively evaluated the existence of adequate competition in the small business tier at the time the competitive range was established with three offerors. Were either argument credited, Greenleaf argues, * * *, not Chapman, would be entitled to the contract.

Greenleaf plainly lacks standing to urge any argument which could lead to an award to * * *. Greenleaf may only posit arguments that demonstrate that, but for the government's alleged breach, it would have had a substantial chance at winning the award. Therefore, the government's motion as to Counts IV and V is granted.

IV. Chapman's Motion to Dismiss for Failure to State a Claim

Chapman filed a separate motion to dismiss. In it, Chapman argues that Greenleaf lacks standing to bring this protest because the procurement was restricted to small businesses either by the establishment of the competitive range or by the Rule of Two. Because the GAO determined that Greenleaf was not small, Chapman reasons that it was not injured because the procurement's restriction to offerors in the small business tier rendered Greenleaf ineligible for award.

In ruling upon a motion to dismiss, the court must presume all undisputed factual allegations to be true and construe the facts in a light most favorable to the plaintiff. *Scheuer v. Rhodes,* 416 U.S. 232, 236–37, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974). Applying this mandate, Chapman's argument fails. If the decision to cascade was correct, Greenleaf would have had access to the unrestrict-

ed tier. Lifting the size restriction, moreover, would likely have netted Greenleaf the contract award.

In its motion, Chapman also argues that the protest amounts to a challenge of the GAO size determination. This is clearly not the case. Greenleaf's protest hinged on a legitimate dispute concerning the use of the cascade procedure.

CONCLUSION

For the foregoing reasons, we grant defendant's motion to dismiss Counts IV and V for lack of standing and deny intervenor's motion to dismiss. We grant defendant's and intervenor's motions to strike and deny intervenor's motions to supplement the record. Finally, we deny plaintiff's motion for judgment on the administrative record and for preliminary injunction and grant the cross-motions of both defendant and intervenor with respect to the balance of the complaint. The clerk is directed to dismiss the complaint. Each party will bear its own costs.

