**NIGHT VISION CORP., Plaintiff,**

v.

**The UNITED STATES of America, Defendant.**

No. 03–1214C.

United States Court of Federal Claims.

Filed Under Seal: Oct. 24, 2005.

Reissued: Nov. 8, 2005 [1].

---

1. This opinion originally was issued under seal on October 24, 2005. The court afforded the parties an opportunity to propose redactions in the opinion prior to its publication, but no such redactions were proposed. Accordingly, the opinion is herein reissued for publication, unsealed.

James S. DelSordo, Cohen Mohr, LLP for the plaintiff.

Kyle E. Chadwick, Commercial Litigation Branch, United States Department of Justice, for the defendant.

## OPINION AND ORDER

BLOCK, Judge.

Ever since Joshua commanded the sun to stop in the sky so that tribes of Israel could have enough light to destroy the Amorites, mankind has sought ways to overcome the disadvantages the darkness of night pose in warfare.[2] The operations of armies have always been degraded at night, as the darkness presents great difficulty in moving soldiers and identifying the enemy. To fight effectively at night, soldiers traditionally relied on artificial illumination, but this tactic often gave away their tactical position and informed the enemy of their maneuvers.

Today, due to technological advances, the U.S. military no longer relies on artificial illumination, let alone dreams of stopping the sun. In fact, it has almost become cliche to say that the United States military "Owns the Night." The phrase is a boast of the military's near perfect night time operations, which have been achieved in part by technological advances over the last fifty years. The widespread use of one technology in particular—night vision goggles ("NVGs")—has allowed the members of our armed forces to overcome the handicap of darkness and operate effectively at night.

The NVGs we are familiar with from combat footage in Afghanistan and Iraq are electro-optical devices that intensify existing light instead of creating an artificial light source.[3] NVGs first capture ambient light,

---

**2.** *Joshua* 10:12–23.

**3.** The technical development of night vision gog-

gles is drawn from Night Vision Goggles,

such as light from the stars, moon or sky glow from man-made sources. This light is then amplified thousands of times by electronic means and displayed via a phosphor screen. The phosphor screen is purposefully colored green because the human eye can differentiate more shades of green than other phosphor colors. Users thus do not look "through" NVGs, but instead look at an amplified electronic image on a phosphor screen.

To maintain its tactical advantage in night fighting capability, the U.S. military constantly seeks to improve existing night vision technology. One area of focus has been in improving the field-of-view of existing NVGs. Historically, the view through NVGs was similar to looking down a tunnel. While a person's natural field-of-view, or peripheral vision, is about 190 degrees, existing NVG technology is limited to roughly 40 degrees of field-of-view. To compensate for this complete absence of peripheral vision, the wearer of NVGs must constantly turn his head side to side. It was the military's desire to mitigate this problem and widen the field-of-vision in NVGs that led to the parties' dispute before this court.

The plaintiff, Night Vision Corporation ("NVC"), is a small business concern that obtained contracts with the United States Air Force for research and development of wide field-of-view NVG technology. NVC successfully developed prototype night vision goggles that expand the field-of-view to 100 degrees without compromising image quality—a technology NVC calls "Panoramic Night Vision Goggles" ("PNVG")—under the Small Business Innovation Research ("SBIR") program. The SBIR program requires certain federal agencies to reserve a portion of their research and development budgets for small business concerns. *See* 15 U.S.C. § 638(e)(4) (1996). Generally speaking, fully successful contractors in the SBIR program proceed in three distinct phases. In Phase I, a small business concern is awarded limited funding to determine "the scientific and technical merit and feasibility of ideas that appear to have commercial potential." *Id.* § 638(e)(4)(A). Following the successful completion of Phase I, a Phase II contract may be awarded, which permits further development of the original idea. *Id.* § 638(e)(4)(B). Phase III envisions a commercial application of the research and development from the prior phases funded by either "non-Federal sources of capital" or "non-SBIR Federal funding." *Id.* § 638(e)(4)(C).

NVC successfully completed both a Phase I and a Phase II contracts under the SBIR program. Nevertheless, the Air Force eventually decided not to award a SBIR Phase III contract. Instead, the Air Force conducted a competitive procurement, ultimately awarding a contract for additional development of the wide field-of-view night vision goggle concept to Insight Technology, Inc. ("Insight"), which had served as NVC's subcontractor under its Phase II contract.

This competitive award to Insight bitterly disappointed NVC and its principals. NVC felt that, based upon its successful completion of the SBIR Phase I and II contracts, it was entitled to receive a Phase III contract. Indeed, NVC was convinced that Air Force officials had promised as much while NVC was developing the PNVG prototype. The award to Insight was particularly irksome because NVC and Insight had a troubled relationship as prime and sub-contractors under the Phase II contract.

NVC's conflicts and competition with Insight—and particularly the actions of Air Force employees with respect to these conflicts and competition—form the factual basis of plaintiff's claims. Plaintiff seeks relief on five separate counts. In count I, plaintiff contends that the Air Force breached its SBIR contracts with NVC by disclosing proprietary technical data to Insight in violation of certain regulations. In count II, plaintiff alleges that the Air Force breached a statutory provision allegedly incorporated by law into NVC's SBIR contracts when the Air Force decided not to award NVC an SBIR Phase III contract. In count III, plaintiff claims that the Air Force breached an implied contract with NVC when it decided not to award NVC an SBIR Phase III contract.

In count IV, plaintiff claims that the Air Force violated a duty of good faith and fair dealing that it owed to NVC "in all facets of the procurement process." Finally, count V consists of a bid protest challenging the award of contract no. F33615–00–C–6000 to Insight instead of NVC.

The parties have filed numerous motions, all of which are opposed, regarding each of plaintiff's claims. As will be explained more fully below, the court grants summary judgment to defendant on count I, since plaintiff failed to present evidence that it affixed data rights legends to the goggles, resulting in a waiver of the protection from disclosure plaintiff seeks to invoke here. The court dismisses count II under RCFC 12(b)(6) because the statute plaintiff seeks to incorporate into the contract, 15 U.S.C. § 638(j)(2), imposes no obligation or duty on either party to the contract. The court grants summary judgment to defendant on count III because plaintiff has failed to produce evidence that a government representative with contracting authority made a contract with plaintiff. The court dismisses count IV under RCFC 12(b)(6) because a key element of this claim must involve a violation of a particular contractual term and the plaintiff's claim assumes there was no contractual obligation to award the Phase III contract. Finally, the court grants defendant's motion for judg-

ment on the administrative record on count V because plaintiff has failed to prove the defendant's evaluation of the bids were arbitrary, capricious, or an abuse an discretion, a threshold issue in a bid protest.

## I. Factual Background [4]

NVC, whose founder and president is Danny Filiopovich, designs "optical image intensification systems" for night vision goggles, which "enable the wearer to see in low-light and no light conditions." D. Resp. PFUF ¶¶ 1–2, 4; Pl. Resp. PFUF ¶ 7; Pl.App. Ex. A, ¶ 2, 4. On May 12, 1995, the Air Force awarded NVC a SBIR Phase I contract under which NVC developed a single prototype of its PNVG design.[5] Pl. Resp. PFUF ¶ 1; D. Resp. PFUF ¶ 21.

On July 12, 1996, the Air Force awarded NVC a SBIR Phase II contract under which NVC arranged for the production of twelve developmental night vision goggle prototypes with the help of a subcontractor.[6] Pl. Resp. PFUF ¶ 3. Seven of these prototypes were in a configuration called PNVG I[7] and five were in a configuration called PNVG II.[8] Pl. Resp. PFUF ¶ 5. Both configurations expanded the field-of-vision provided by existing night vision goggle technologies while maintaining similar image resolutions.[9] Pl. App. Ex. 13 at 365.

---

4. These facts are derived from the following sources: (1) the appendix to plaintiff's motion for summary judgment ("Pl.App."); (2) the appendix to defendant's cross-motion for summary judgment ("D.App."); (3) plaintiff's response to defendant's proposed findings of uncontroverted fact ("Pl.Resp.PFUF"); (4) defendant's response to plaintiff's proposed findings of uncontroverted fact ("D.Resp.PFUF"); (5) defendant's supplemental appendix ("D.Supp.App."); (6) plaintiff's counter-statement of facts for count V ("Pl. CSF"); and (7) the parties' pleadings, motions, and supporting memoranda.

5. The Air Force awarded NVC Contract No. F41624–95–C–6004 on May 12, 1995. D.App. Ex. 1.

6. The Air Force awarded NVC Contract No. F41624–96–C–6005 on July 12, 1996. D.App. Ex. 2.

7. The PNVG I configuration was apparently designed for use by pilots of fixed-wing aircraft. NVC contends that the PNVG I was safer for a pilot to wear during ejection from aircraft than

earlier systems. D. Resp. PFUF ¶ 79; Pl.App. Ex. A ¶ 18.

8. The PNVG II configuration, which was intended for use by helicopter pilots, "was to be a less expensive, less sophisticated version of the PNVG I system," according to Mr. Filipovich. Pl.App. Ex. A, ¶ 31.

9. As alluded to in the introduction, prior night vision goggle technologies, which incorporated two optical channels (like a pair of binoculars) generally provided a circular 40 degree field-of-vision. Pl.App. Ex. 13 at 366. Field-of-vision in these earlier systems could only be increased at the expense of image resolution, because each optical channel incorporated a single image intensifier tube with a limited number of pixels. Id. If this limited number of pixels are "spread over a larger [field-of-vision], the angular substense per pixel increases proportionally," which results in reduced resolution. D.App. 45. Incorporating four optical channels (and thus four image intensifier tubes), NVC's PNVG goggles were designed to maintain resolution while increasing the field-of-vision to 100 degrees hori-

The Air Force Research Laboratory ("AFRL") at Wright–Patterson Air Force Base administered NVC's SBIR contracts. Pl. Resp. PFUF at ¶2. NVC worked with several AFRL employees, including: Jeffrey Craig, an engineer and night vision technology specialist; Randy Brown, an AFRL program manager; Dr. H. Lee Task, the senior scientist advisor for NVC's SBIR contracts; and two contracting officers, Judith Demos, who served as the contracting officer throughout most of NVC's performance of its SBIR contracts, and Mary Jones, who succeeded Ms. Demos late in the process. Pl. Resp. PFUF at ¶¶2, 4; D. Resp. PFUF at ¶37.

Sometime after July 1996, Insight agreed to serve as NVC's primary subcontractor under the SBIR Phase II contract. D. Resp. PFUF ¶23–25. Insight was founded in 1987 by a former Army employee named Kenneth Solinsky, who currently serves as the company's president. D. Resp. PFUF ¶25; Pl. App. Ex. L at 5. Among other things, this subcontract (hereinafter "Phase II subcontract") required Insight to "assist in the design and manufacture of the plastic housings and bridge assembly for the PNVG I units," convert NVC's design "into engineering drawings suitable for manufacture," and "fabricate and assemble the goggle assembly." D. Resp. PFUF ¶23; Pl.App. Ex. A ¶27. Unfortunately, the record reveals that NVC and Insight did not work well together, and the two companies maintained a tenuous relationship.

Long before NVC completed performance of its Phase II contract, the Air Force considered the possibility of awarding NVC an SBIR Phase III contract. For instance, in early 1997, Mr. Filipovich stated that Air Force personnel instructed him to prepare NVC for performance of an SBIR Phase III contract. In particular, Air Force personnel indicated that because NVC lacked any production capability it needed to either "develop the production capability that would be required for production in a SBIR Phase III, or subcontract with a company capable of producing the PNVG system." Pl.App. Ex. A ¶20.

It was the potential work under a future SBIR Phase III contract that was grist for much of the dispute between Insight and NVC. In April 1998, Mr. Solinsky demanded that Insight "be granted exclusive manufacturing rights" for any SBIR Phase III contract, and threatened to stop work under the Phase II subcontract (thus threatening NVC's ability to perform) until Insight received this guarantee. D. Resp. PFUF ¶41.

Although it initially resisted, NVC sent a letter to Insight on May 8, 1998 promising that "during ... Phase III, [Insight] will be the exclusive manufacturer for both the PNVG I and PNVG II." Pl.App. Ex. 64; Pl.App. Ex. D, ¶3. After obtaining this promise, Mr. Solinsky sought a further guarantee that Insight would have a role in production beyond Phase III. D. Resp. PFUF ¶49. Contemporaneous with this demand, Insight stopped work and also withheld from NVC a set of drawings that it was required to deliver to NVC under the Phase II subcontract. Pl.App. Ex. H at 208–10, 213–14; Pl.App. Ex. J at 174–75, 213–16.

By July 1998, the disputes between NVC and Insight threatened completion of the Phase II contract. On July 8, 1998, in an attempt to resolve the conflicts between NVC and Insight, Air Force personnel met with representatives of the two companies. Pl.App. Ex. H at 210–14. At this meeting, Mr. Solinsky renewed both his demand for a guarantee that Insight would be NVC's exclusive manufacturer beyond any SBIR Phase III contract and his threat that until it received this guarantee, Insight would not perform under the Phase II subcontract. D. Resp. PFUF ¶56; Pl.App. Ex. J at 226–27. The parties at the meeting discussed and drafted a teaming agreement to be executed by NVC and Insight. D. Resp. PFUF ¶¶57–8, 63–4; Pl.App. Ex. J at 229–45. The next day, NVC and Insight executed this agreement, which (among other things) guaranteed that if the Phase II contract led to a Phase III contract, Insight would be NVC's manufacturer; the teaming agreement also protected Insight's proprietary data from

zontal and 40 degrees vertical, an increase of 160 percent. D.App. 44.

disclosure to third parties. Pl.App. Ex. 91; D. Resp. PFUF ¶ 64.

Throughout the rest of 1998, the Air Force and NVC continued to discuss the possibility of work under an SBIR Phase III contract. For instance, on December 15–16, 1998, Air Force personnel, met with NVC to discuss "acquisition strategy" related to the PNVG program. Pl. Reply Pl. Mot. Summ. J. Ex. A, ¶ 26. At that time, Air Force employees discussed with NVC how the development and production of NVC's night vision goggle technology would proceed under an SBIR Phase III contract. Pl. Reply Pl. Mot. Summ. J. Ex. A, ¶¶ 24–27.

It appears that by the Spring of 1999, however, the Air Force was considering alternatives to awarding NVC an SBIR Phase III contract. In April 1999, Mr. Brown apparently asked Insight for quotes for the manufacture of 500 PNVG I and 1,000 PNVG II units. Pl.App. Ex. 153. In an email dated April 19, 1999, Mr. Solinsky responded with the requested quotes; an email exchange elaborating on these quotes between Solinsky and Mr. Brown followed. *Id.*

As the completion of the SBIR Phase II approached, all of the parties' focus turned more to determining how the development of the PNVG would proceed. On June 24, 1999, Mr. Filipovich took part in a conference call with Air Force employees, including Mr. Brown, Mr. Craig, Dr. Task, and Mr. Kocian, regarding the possibility of an SBIR Phase III contract. Pl.App. Ex. A ¶ 63. According to Mr. Filipovich, Mr. Brown told him that "the Air Force did not want to offer Phase III to NVC, but, instead, wanted NVC to sell its technology to Insight and become a consultant to Insight." *Id.* Mr. Filipovich also stated that Mr. Kocian told him: "[y]our only option is to sell [your technology] to Insight. Otherwise, you will never get another contract from the Air Force." *Id.* at ¶ 65. Further, Mr. Filipovich claims that Mr. Brown and Dr. Task confirmed that "NVC has no option but to sell NVC or its technology to Insight." *Id.* at ¶ 66. Mr. Brown's notes related to this call indicate that the Air Force "probably would not pursue" awarding the SBIR Phase III contract to NVC and that awarding the SBIR Phase III contract to

Insight as the prime contractor with NVC as a subcontractor was the "preferred approach." Pl.App. Ex. 745.

Mr. Filipovich sent a letter the next day to Mr. Brown and Mr. Craig, summarizing his understanding of what he had been told in the previous day's phone call. Pl.App. Ex. 191. Mr. Filipovich wrote he had been told the Air Force would not offer NVC a SBIR Phase III contract. *Id.* Moreover, Mr. Filipovich wrote, he was told that NVC should not submit—and the Air Force would not accept—a SBIR Phase III contract proposal from NVC. *Id.* Mr. Filipovich also wrote that he had been encouraged to sell the PNVG program and the related technology to Insight, who would then serve as the prime contractor. *Id.*

On June 28, 1999, the Air Force officially announced that it was considering a competitive procurement instead of issuing a SBIR Phase III contract to NVC. Pl.App. Ex. 192. On that date the Air Force published a notice entitled "Potential Sources Sought," seeking possible developers of a "night vision goggle" offering "a wider field of view (at least 100 degree horizontal by 40 vertical . . .) and high resolution." *Id.* This document publicized that the Air Force would seek to develop two versions of the goggles. *Id.* The related descriptions in the document seem to correspond with NVC's PNVG I and PNVG II configurations. *Id.*

At this time, Insight was preparing to compete directly against NVC for a contract to develop the PNVG system. On July 1, 1999, Insight executed an agreement with ITT Industries, Inc. ("ITT") to work together towards obtaining a PNVG competitive procurement contract. Pl.App. Ex. 198. ITT was another indispensable subcontractor to NVC under its SBIR contracts, supplying the "image intensifier tubes" for the PNVG system. Pl.App. Ex. A ¶ 32.

On July 7, 1999, representatives from Insight and ITT met with Air Force personnel to present a sales pitch they called "PNVG: Road to Production." D. Resp. PFUF ¶ 96; Pl.App. Ex. 203. Among other things, this presentation addressed potential legal issues related to the Air Force's decision to proceed

with a competitive procurement instead of awarding NVC a SBIR Phase III contract. Pl.App. Ex. 203 at DE000967–73. Specifically, Insight and ITT claimed that pursuant to 48 C.F.R. § 252.227–7018 Insight and ITT enjoyed some data rights related to the PNVG program as subcontractors to NVC. *Id.* at DE000970–72. Still, Insight and ITT's presentation ultimately recommended that the "Government should acquire unlimited data rights and provide [those rights] to all competitors." *Id.* at DE000972.

On July 13, 1999, the Air Force sent a letter to NVC directing it to incorporate into its subcontracts 48 C.F.R. § 52.227–11, a provision regarding data rights protections afforded to subcontractors of federal government contracts. Pl.App. Ex. 204. On July 14, 1999, the Air Force sent another letter to NVC announcing its intention to pursue development of the PNVG through a competitive procurement. Pl.App. Ex. 205. This letter also stated that the Air Force would like to obtain "government purpose rights" to NVC's proprietary data. *Id.*

Later that month, it appears that Insight and ITT began actual work on a night vision goggle system that would compete with NVC's PNVG. Pl.App. Ex. 218, 219. Based on this preliminary work on or about July 22, 1999, personnel from the Army Night Vision Laboratory requested a cost estimate for the development of up to 20,000 PNVG. Pl.App. Ex. 206.

On July 30, 1999, Insight delivered to NVC the drawings it was required to generate under the SBIR Phase II subcontract. D. Resp. PFUF ¶ 111. The same day, NVC delivered the final data package for its SBIR Phase II contract to the Air Force which included both technical information (such as drawing and schematics) and prototypes of the goggles. Pl.App. Ex. A, ¶ 70. NVC claims that it marked all technical data that it delivered to the Air Force with data rights legends indicating that the data was proprietary. D. Resp. PFUF ¶ 111; Pl.App. Ex. 236. Nonetheless, it is uncontroverted that NVC did *not* affix such legends to the actual goggles that it delivered to the Air Force along with the technical documents (a significant factor discussed at length below).

As a contract monitor under NVC's SBIR Phase II contract, Mr. Craig received the goggles that NVC delivered to the Air Force under the contract. D.App. 153. Mr. Craig stated that none of these goggles were marked with a restrictive data rights legend, nor were they accompanied by a transmittal document or storage container bearing any such restrictive data rights legend. *Id.* Mr. Craig stated his belief that all the goggles were marked "patent pending." *Id.*

With the delivery of the final data package, NVC's SBIR Phase II performance was complete. Pl.App. Ex. A ¶ 70. According to plaintiff, NVC "fully and satisfactorily performed all of its obligations" under both its SBIR Phase I and Phase II contracts. Pl. Reply Pl. Mot. Summ. J. Ex. A ¶¶ 13–14. Also, the results that NVC obtained under both of its SBIR contracts "met the Air Force's expectations." *Id.* at ¶¶ 15, 17.

Despite the successful completion of the SBIR Phase II contract, the Air Force remained reluctant to award NVC a Phase III contract. This was apparent from a meeting of Air Force personnel on August 23, 1999. Materials from a presentation given in that meeting stated that the Air Force "did not see any value in NVC conducting a Phase III." Pl.App. Ex. 264. This presentation was concluded with the following text: "Recommendation: Acquire Government Purpose Data Rights to PNVG Phase 2 data. Conduct full and open competition for PNVG follow-on contract. Provide PNVG data as a baseline for design." *Id.* Plaintiff has produced typed notes by an unidentified author, apparently related to this meeting, that contain the words: "Laboratory does not want to award to NVC." Pl.App. Ex. 270. Concerning a NVC SBIR Phase III proposal, the notes indicate that the Air Force would "allow NVC to submit," and "if acceptable, award to NVC, if not acceptable, do one of two things, pursue purchase of data rights from NVC or issue a [Program Research and Development Announcement] for the technology." *Id.*

On August 27, 1999, Air Force and NVC representatives met at Wright–Patterson Air Force Base. At that meeting, Ms. Jones stat-

ed that the Air Force was considering either "issuing a Phase III or pursuing full and open competition." D. Resp. PFUF ¶ 128; Pl.App. Ex. 275, NV11770. Mr. Filipovich asked if the Air Force would consider evaluating a SBIR Phase III proposal from NVC. Pl.App. Ex. 275 at NV11770. According to a file memorandum regarding the meeting, Ms. Jones replied that "should [NVC] choose to submit a Phase III proposal the government would evaluate it." *Id.* at NV11774. Ms. Jones also explained that the Air Force would not request such a proposal or guarantee an award. *Id.* When Mr. Filipovich replied that NVC would not want to submit a proposal if a SBIR Phase III contract was not a valid option, Ms. Jones stated that "the government cannot guarantee that we will award a Phase III contract just because a Phase III proposal is submitted." *Id.* Similarly, according to Dr. Task, Mr. Filipovich asked if "he would be guaranteed of getting the contract" if he submitted a Phase III proposal. D.App. 126. Dr. Task responded that "there is no guarantee to getting a [Phase III] until after we see the proposal and can evaluate [it]." *Id.* It is important to note that NVC did not submit a proposal for a SBIR Phase III contract. D.App. 111; Pl. Resp. PFUF ¶ 9.

Notes from that meeting, apparently written by Ms. Jones, under the heading "NVC's purpose," state: " 'Sob Story' company is going under and it is the Government's fault because NVC (I think) has been promised a Phase III somewhere along the way. Now the Government is telling NVC we are not sure if that is in the strategy." Regarding another Air Force employee's reaction to the meeting, Ms. Jones wrote: "She got the same feeling I did from the meeting and that is she thinks we have promised NVC a Phase III proposal somewhere along the way." Pl. App. Ex. 277.

During this time the Air Force remained to be in communication with Insight about work on the PNVG system. Several times in August and September 1999, the Air Force mailed to Insight PNVG prototypes that NVC had delivered under the SBIR Phase II contract. D. Resp. PFUF ¶ 114–15; Pl. Reply Pl. Mot. Summ. J. Ex. A, ¶ 3–6. Insight apparently retained some of these PNVG units for several days or weeks while shipping other units back to the Air Force only a few days after receiving them.[10] D. Resp. PFUF ¶ 114–15; Pl. Reply Pl. Mot. Summ. J. Ex. A, ¶ 3–6. A photograph of a disassembled PNVG II unit was among the materials Insight produced in discovery in its litigation with NVC in the Eastern District of Virginia. D. Resp. PFUF ¶ 132; Pl.App. Ex. 702. Still, Mr. Solinsky denied that Insight disassembled the PNVG prototypes that the Air Force sent to him. Pl.App. Ex. L at 268. However, Mr. Solinsky acknowledged that Insight took measurements of the PNVG prototypes.[11] *Id.*

Additionally, on September 10, 1999, Mr. Craig reported results of flight tests conducted with the NVC's prototype PNVG to Insight. D. Resp. PFUF ¶ 133. According to NVC, it was not informed of this conversation. *Id.* On September 17, 1999, an Insight employee set up a meeting with Mr. Craig to discuss technical issues. *Id.* at ¶ 138.

On September 29, 1999, Mr. Brown sent an e-mail to other Air Force personnel stating that the Air Force had requested NVC to declare its "intentions on submitting a Phase III proposal." D. Resp. PFUF ¶ 140; Pl. App. Ex. 316. This e-mail also stated that the Air Force was "proceeding very cautiously" and was "not willing to commit to pursuing full and open competition at this time." D. Resp. PFUF ¶ 140; Pl.App. Ex. 316.

On October 7, 1999, Air Force, Insight, and NVC representatives met to discuss the uno-

10. On December 8, 1999, George W. Bush, then a candidate for the presidency, visited Insight and posed for photographs holding prototypes of the goggles designed by NVC under its Phase II SBIR contract. D. Resp. PFUF ¶ 151; Pl.App. Ex. 371, 373. As before, the Air Force (Mssr. Craig and Brown) had sent the PNVG prototypes that appear in this photograph to Insight. D. Resp. PFUF ¶ 151; Pl.App. Ex. 371, 373.

11. During this time, Insight was not under contract with the Air Force to maintain or repair the PNVG systems. On the contrary, Insight declined an opportunity to perform maintenance on the PNVG systems. D. Resp. PFUF ¶ 113; Pl. Reply Pl. Mot. Summ. J. Ex. A, ¶ 2; Pl.App. Ex. 711.

bligated plus-up funds and the possibility of working together under a SBIR Phase III contract. D. Resp. PFUF ¶ 141; Pl.App. Ex. 322. Specifically, Mr. Brown and Mr. Craig acknowledged that the Air Force needed to use the unobligated funds, or else it would lose them. D. Resp. PFUF ¶ 143.

On October 18, 1999, Mr. Filipovich wrote a letter to the Air Force arguing that NVC should be awarded a sole source, SBIR Phase III contract. Pl. Resp. PFUF ¶ 7. Mr. Filipovich did not claim in that letter that the Air Force had previously agreed to award it a SBIR Phase III contract. *Id.*

On October 21, 1999, Mr. Solinsky wrote a letter to Ms. Jones requesting a meeting with the Air Force to discuss the PNVG program and make a presentation regarding work Insight and ITT had done since June 29, 1999. D. Resp. PFUF ¶ 146.

By November 1999, the Air Force appears to have been leaning toward its ultimate decision against awarding NVC a Phase III contract. On November 3, 1999, Mr. Craig and Mr. Brown prepared a document entitled "Integrated Panoramic Night Vision Goggle: Information Brief." D. Resp. PFUF ¶ 147; Pl.App. Ex. 348. The Information Brief listed two options for future contracts: (a) full and open competition in which NVC and Insight would compete; and (b) a SBIR Phase III contract with NVC. Pl.App. Ex. 348, AF200962. This document also gave several factors that weighed against pursuing a SBIR Phase III contract with NVC:

- "[NVC] is a very small company; limited capability to manage next phase"
- "Limited innovative solutions"
- "No incentive to control costs"
- "Limited data rights"
- "Phase II subcontractors on NVC proposed team are unwilling to participate"
- "Bottom Line: there is no longer a team for a SBIR Phase III award."

*Id.* AF200963. The Information Brief's recommendation was that the Air Force pursue full and open competition. *Id.*

The Air Force's inclination against awarding NVC a Phase III contract continued throughout November. The Air Force Chief of Staff noted on or before November 9, 1999, that the Air Force would compete the PNVG Phase III program. Pl.App. Ex. 354. Likewise, on November 17, 1999, the Secretary of the Air Force in a letter indicated that the Air Force "plan[ned] to hold a full and open competition to finish the PNVG development." D. Resp. PFUF ¶ 149.

The Air Force made its final decision against awarding NVC a SBIR Phase III contract in December 1999. An Air Force "Acquisition Strategy Panel" met on December 1, 1999 to discuss the Air Force's plan for future development of the PNVG program. Pl.App. Ex. 364, 365, 366. The Acquisition Strategy Panel reviewed factors for and against pursuing either full and open competition or a SBIR Phase III contract with NVC. Pl.App. Ex. 365 at AF103267–68.

The panel specifically cited the reasons against pursuing a SBIR Phase III with NVC that were listed in the November 3, 1999, Information Brief. *Id.* at AF103268. The panel also noted that "[NVC] had difficulty in managing the Phase II contract which is less of a management challenge than a new Phase III contract would be." *Id.* The panel ultimately recommended that the Air Force procure further PNVG development through full and open competition using the Program Research & Development Announcement ("PRDA") procedure. *Id.* at AF103266–68, AF103277.

On December 10, 1999, Donald L. Utendorf, then Chief of the Research and Development Contracting Office for the Technology Directorates at Wright–Patterson Air Force Base, decided that the Air Force would issue the PRDA instead of awarding a SBIR Phase III contract to NVC. D.App. 159–61. In reaching this conclusion, Mr. Utendorf adopted the recommendation of Maris Vikmanis, an AFRL technical management leader, and the AFRL Acquisition Strategy Panel. D.App. 160.

On December 16, 1999, the AFRL, in conjunction with the United States Army Night Vision and Electronic Sensors Directorate, posted Program Research and Development Announcement ("PRDA") No. 00–01–HE. Pl. CSF ¶ 1; D. Resp. PFUF ¶ 150. The purpose of the PRDA was "to award a nego-

tiated, 24–month Advanced Technology Demonstration ('ATD') contract" for what the Air Force called Integrated Panoramic Night Vision Goggles ("IPNVG"). Pl. CSF ¶ 1.

On January 7, 2000, Mr. Filipovich sent a letter to Ms. Jones, expressing concern about protecting NVC's SBIR data rights in connection with the PRDA. *Id.* at ¶ 6. Mr. Filipovich's letter stated, among other things, that "[o]nly those designs that are developed independently and without reliance on NVC's proprietary design concepts should be accepted by the Government." *Id.*

In January 2000, Litton Systems, Inc. ("Litton") requested that the Air Force permit it to borrow a PNVG unit for two weeks—or at least examine a PNVG unit at an Air Force facility. *Id.* at ¶ 7. In a letter dated January 28, 2000, Ms. Jones informed Litton and other potential bidders that they could examine one PNVG unit at Wright–Patterson Air Force Base for up to three hours. *Id.* During this examination, Ms. Jones informed the potential bidders, "[d]isassembly of the PNVG will not be allowed." *Id.* Moreover, Ms. Jones emphasized that the "Air Force is not looking for a copy of the PNVG as designed under the previous [SBIR] contracts[,] which is why we have elected to issue a [PRDA, which] encourages industry to propose new and creative solutions." *Id.*

On January 31, 2000, Mr. Filipovich sent an email to Ms. Jones stating that allowing other potential bidders to inspect a PNVG was "a violation of NVC's SBIR DATA RIGHTS." *Id.* at ¶ 8. James David Box, an Air Force contracting officer, responded to this email in a letter dated February 2, 2000. *Id.* at ¶ 9. Mr. Box stated: "After much research and consideration, I am convinced that allowing limited inspection of the PNVG goggle does not violate NVC's SBIR data rights nor patent rights." *Id.* Mr. Box also added: "Please be assured that the Air Force's goal is to strive for new and creative solutions to the PNVG, and not merely to reproduce the goggles made by NVC under the SBIR program. This is why we have limited the inspection to a 3 hour period ... and prohibited the disassembly of the goggle." *Id.*

Three companies submitted bids in response to the PRDA: NVC, Insight, and Litton. *Id.* at ¶ 10. On March 22, 2000, following technical evaluations of the proposals, the evaluation team ranked Insight first, based upon technical merit, followed by Litton. NVC's proposal was ranked as "Category III" and ineligible for award, because it did not meet agency needs. *Id.*

The technical evaluation team's summary of comments regarding NVC's bid concluded that "[t]he majority of the program team has not been identified and there is no supporting documentation from any of the subcontractors, showing cost or commitment to perform. Therefore, NVC's proposal does not meet agency needs." *Id* at ¶ 11.

The technical evaluators' overall summary with respect to Insight was much more favorable: "Insight addresses all of the important aspects of their approach for developing a well conceived Integrated PNVG/ANVG. They provided detailed information of the design approach they plan to pursue and this made it easier to address the amount of risk associated with their effort." *Id.* ¶ 12.

The Air Force entered into negotiations with Insight on April 3, 2000 and awarded Insight contract number F33615–00–C–6000 on April 7, 2000. Pl. CSF ¶ 13.

## II. Jurisdiction and Standard of Review

This court has jurisdiction over plaintiff's express contract, implied contract, and bid protest claims under the Tucker Act, which confers jurisdiction on this court for claims against the United States founded on "an express or implied contract" and for "action[s] by an interested party objecting to ... the award of a contract" by a federal agency. 28 U.S.C. § 1491(a)(1), (b)(1); *United States v. Testan*, 424 U.S. 392, 397, 96 S.Ct. 948, 47 L.Ed.2d 114 (1976).

The standards this court must follow in deciding summary judgment motions and motions to dismiss for failure of the pleading to state a claim are quite clear. As to grant summary judgment, this court may only grant summary judgment when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. RCFC 56; *Anderson v. Lib-*

*erty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In its summary judgment inquiry, the court must carefully scrutinize the proffered facts to determine exactly what is at issue, but it is important to also note that this does not mean that all contradictions of fact are fatal. *Anderson,* 477 U.S. at 247, 106 S.Ct. 2505. In this inquiry, "factual disputes that are irrelevant or unnecessary will not be counted." *Id.* Summary judgment can still be granted where the disagreement is tangential to the case; that is, the factual dispute is not "material" because it would not make a difference in the result of the case under the governing law. *Id.*

It is now well-accepted that a moving party is not required to produce evidence showing an absence of genuine material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). A moving party need only point to an absence of evidence for a required element of the nonmoving party's case. *Id.* Moving parties may succeed, therefore, whether or not they rely "on the pleadings, depositions, answers to interrogatories and admissions on file." *Id.* at 324, 106 S.Ct. 2548. Even so, when a moving party properly identifies an absence of evidence in the nonmoving party's case, the burden then shifts to the nonmoving party to make a showing sufficient to establish that element or create an issue of material fact. *Id.* at 322, 106 S.Ct. 2548. It is critical to note that the nonmoving party may not rely on conclusory statements or assertions. *Id.* at 324, 106 S.Ct. 2548. Once the burden shifts, the nonmoving party must go beyond its own pleadings and identify specific facts in the record that show that there is a genuine issue as to material fact for trial. *Id.* If it does not, summary judgment must be rendered in favor of the moving party. *Id.*

On cross-motions for summary judgment (as the parties have here filed regarding plaintiff's data rights claim), the standard is somewhat different, bowing to common sense. For instance, the court may not assume there are no genuine issues as to material fact. *Prineville Sawmill Co. v. United States,* 859 F.2d 905, 911 (Fed.Cir.1988) (citing *Mingus Constructors, Inc. v. United States,* 812 F.2d 1387, 1391(Fed.Cir.1987)). Yet, the court must still evaluate each party's motion on its own merits, remembering to make all reasonable inferences against the party whose motion is being considered. *DeMarini Sports, Inc. v. Worth, Inc.,* 239 F.3d 1314, 1322 (Fed.Cir.2001).

As for the standard the court must follow in deciding motions to dismiss for failure of the pleading to state a claim pursuant to RCFC 12(b)(6), and unlike summary judgment, only a "facial" challenge to the legal sufficiency of the complaint is examined. In other words, granting this motion must solely be "based on the facts alleged in the complaint" when "the law countenances no remedy." *Client Network Servs., Inc. v. United States,* 64 Fed.Cl. 784, 789 (2005); *see, e.g., Perez v. United States,* 156 F.3d 1366, 1370 (Fed.Cir.1998). In its 12(b)(6) inquiry, the court accepts all well-pleaded facts as true and draws all reasonable inferences in favor of the plaintiff. *Id.* Additionally, Rule 12(b)(6) requires the court to treat the motion as one for summary judgment if matters outside the plaintiff's pleading are presented.[12] *See Advanced Cardiovascular Sys., Inc. v. Scimed Life Sys., Inc.,* 988 F.2d 1157, 1164 (Fed.Cir.1993). Thus, the granting of dismissal is only proper when plaintiff can "prove no set of facts" that would entitle it to legal relief. *Southfork Sys. v. United States,* 141 F.3d 1124, 1131 (Fed.Cir.1998).

### III. Discussion

Risking a bit of redundancy for the ease of reading, the court restates the grounds of plaintiff's complaint. It consists of five claims for relief, each to be addressed in turn. Count I alleges that defendant breached the SBIR contracts with plaintiff by dis-

---

12. RCFC 12(c) provides in part that if:

on a motion asserting the defense numbered (6) to dismiss for failure of the pleading to state a claim upon which relief can be granted, matters outside the pleading are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56, and all parties shall be given reasonable opportunity to present all material made pertinent to such a motion by Rule 56.

RCFC 12(c).

closing proprietary technical data to Insight. Count II alleges that defendant breached a provision allegedly incorporated by law into the SBIR contracts with plaintiff, which required defendant to award plaintiff a SBIR Phase III contract. Count III alleges defendant breached an oral contract with plaintiff by not awarding plaintiff a SBIR Phase III contract. Count IV alleges defendant violated a duty of good faith and fair dealing owed to plaintiff throughout the procurement process. Finally, count V consists of a bid protest challenging the award of contract no. F33615–00–C–6000 to Insight instead of NVC.

## A. Did Defendant Breach Plaintiff's SBIR Data Rights?

The parties have filed cross-motions for summary judgment on count I, in which plaintiff claims that defendant violated a prohibition against disclosing plaintiff's proprietary data when defendant sent PNVG prototypes to Insight.[13] Pl. Mot. Summ. J. 30–33; D. Mot. Summ. J. 6–11. Plaintiff argues that PNVG prototype units themselves constitute proprietary "technical data" [14] and are entitled to protection from government disclosure under 48 C.F.R. § 252.227–7018 (2005). Pl. Mot. Summ. J. 30–33. Defendant argues that plaintiff waived any legal protection from disclosure of data rights since the plaintiff delivered the goggles to defendant without protective markings that are required by the regulation as a condition to the protection it offers. D. Mot. Summ. J. 6–11. Defendant further argues that the legal protection plaintiff seeks does not apply to the actual goggle prototypes, since tangible products delivered under a SBIR contract are not "technical data." *Id.* The court essentially concurs with defendant.

Since the material facts are not disputed by the parties, the issues this court must determine for summary judgment are pure questions of law. *Terlep v. Brinkmann Corp.*, 418 F.3d 1379, 1381 (Fed.Cir.2005); *Dana Corp. v. United States*, 174 F.3d 1344, 1347 (Fed.Cir.1999) (summary judgment appropriate because no material facts were disputed and the only disputed issues were issues of law). In particular, the court must first decide if the absence of a SBIR data rights legend on items delivered to the government constitutes a waiver of any regulatory protections that might otherwise limit disclosure. Because the legal issue of whether a physical prototype in-and-of-itself can constitute "technical data" appears to be one of first impression, it is appropriate for the court to first determine the waiver issue. *See Ashwander v. Tennessee Valley Auth.*, 297 U.S. 288, 324, 56 S.Ct. 466, 80 L.Ed. 688 (1936) ("The judicial power does not extend to the determination of abstract questions."). Only if the absence of the legend does not constitute a waiver of regulatory protections would the court then need to reach the underlying definitional issue.

The parties' SBIR Phase II contract incorporates by reference 48 C.F.R. § 252.227–7018, the SBIR limited data rights provision. D.App. 33. This provision generally prohibits the government from releasing or disclosing "SBIR data to any person other than its support service contractors." 48 C.F.R. § 252.227–7018(b)(4)(ii). On its face, this regulation would prohibit defendants from leasing protected "data" to Insight. Nevertheless, this same provision requires that a contractor clearly mark data with a prescribed legend that the contractor wishes to protect from disclosure. *Id.* § 252.227–7018(f). In particular, the FAR provides: "The Contractor . . . may only assert restric-

---

**13.** The complaint also alleged that defendant disclosed "other proprietary data," but plaintiff has abandoned that claim. *See* Pl. Mem. Opp'n Summ. J. 3, n. 1.

**14.** A variety of terms in the regulations governing the protection of SBIR data rights are often used interchangeably. In the interest of clarity, the definition of those terms are:
- "Data": "recorded information, regardless of form or the media on which it may be recorded. The term includes technical data and

computer software." 48 C.F.R. § 52.227–20(a).
- "SBIR data": "data first produced by a Contractor that is a small business firm in performance of a small business innovation research contract . . ." 48 C.F.R. § 52.227–20(a).
- "Technical data": "recorded information, regardless of the form or method of the recording, of a scientific or technical nature . . ." 48 C.F.R. § 252.227–7018(a)(19).

**380**

tions on the Government's rights to use, modify, reproduce, release, perform, display, or disclose technical data ... to be delivered under this contract by marking the deliverable data ... subject to restriction." *Id.* Contractors must use the legend provided in the same provision to preserve the protection of their data from disclosure. *See id.* The SBIR data rights legend prescribed by the FAR requires the contractor to list information such as the contract name and number and the expiration date of the SBIR data rights period. The legend must also include the following language: "The Government's rights to use, modify, reproduce, release, perform, display, or disclose technical data ... marked with this legend are restricted during the period shown .... No restrictions apply after the expiration date shown above." *Id.* § 252.227–7018(f)(4).

■ By its own language, § 252.227–7018(f) indicates that a contractor may only restrict the government's use and disclosure of technical data by marking the deliverable data with the appropriate data legend. A failure to use the appropriate legend results in the government receiving complete, unrestricted use. Other sections of the FAR which limit the government's rights in proprietary data developed by contractors have consistently been interpreted in this vein. *See Ervin & Assocs., Inc. v. United States,* 59 Fed.Cl. 267 (2004) (notwithstanding contractor's "oral statements, letters, and e-mails" allegedly asserting protection of proprietary data, the contractor's failure to mark data with the "Limited Rights Notice" prescribed in 48 C.F.R. § 52.227–14 resulted in government obtaining unlimited data rights); *Gen. Atronics Corp.,* ASBCA No. 49196, 2002 WL 450441 (Mar. 19, 2002); *E.M. Scott & Assocs.,* ASBCA No. 45,869, 94–3 BCA ¶ 27,059, 1994 WL 409331 (July 28, 1994) (contractor's failure to use the restrictive legend of 48 C.F.R. § 52.215–12 gave government unrestricted rights to data); *Bell Helicopter Textron,* ASBCA No. 21,192, 85–3 BCA ¶ 18,415, 1985 WL 17050 (Sept. 23, 1985) (contractor's failure to mark technical engineering drawings with a restrictive legend required by a contract clause similar to 48 C.F.R. § 252.227–7013 resulted in the gov-

ernment receiving unlimited rights to the data conveyed by the drawings).

■ The court finds persuasive the reasoning of the Armed Services Board of Contract Appeals ("ASBCA") in *General Atronics Corp.* There the Navy requested that a contractor include proprietary computer software along with technical hardware called for in the contract. The contractor argued that the Navy's use of the software should be restricted and brought a claim for software licensing fees to cover the Navy's additional use of the software. The ASBCA noted that the contract incorporated 48 C.F.R. § 252.227–7013, which covers rights in technical data and requires a legend to be placed on all data to restrict the governments use. The ASBCA pointed out that the contractor delivered the software to the Navy without the restricted rights legend required by § 252.227–7013. The ASBCA also found immaterial the fact the contractor had delivered technical manuals for the hardware with an appropriate restricted right legend, since those manuals had not specifically made any assertions regarding the software. As a result, the ASBCA concluded that the Navy had acquired unlimited rights to the software and denied the contractor's claim.

As in *General Atronics Corp.,* it is undisputed that neither the prototypes that plaintiff delivered to defendant nor the packaging in which those prototypes arrived were marked with proprietary data legends. D.App. 153. This failure to use an appropriate data legend gave the government unrestricted use to the PNVG prototypes. Plaintiff's argument that it was sufficient to have affixed the legend to the "technical drawings and documentation" associated with the goggles is not persuasive. To allow an exception to § 252.227–7018 as the plaintiff advocates would be contrary to the language of the regulation, contradict its intent, and ultimately render the regulatory protection of data unworkable. There simply is no provision in 48 C.F.R. § 252.227–7018 for the extension of the data rights protection from properly marked data to unmarked delivered data. The interpretation of similar sections of the FAR have also not found such extensions of protection. *See Gen. Atronics Corp.,* 2002

WL 450441 (contractor's submission of a technical manual with a restrictive legend did not protect software submitted without the appropriate restrictive legend); *Bell Helicopter Textron,* 1985 WL 17050 (contractor's submission of 82 technical engineering drawings with a restrictive legend did not protect 21 related drawings submitted without a restrictive legend).

To read an exception into the regulation as the plaintiff advocates would undermine the entire purpose of restrictive legends. Restrictive legends alert all government officials—even those unfamiliar with the data rights of the contractor—that data is considered proprietary and is inappropriate for dissemination. Creating exceptions to the restrictive rights requirement would place government officials in the difficult position of being unsure which data was subject to restrictions and which was not. The least cost burden in such instances rests with the contractor, who can easily apply an appropriate legend to the proprietary data.[15] Crafting a workable exception to the restrictive legend requirement is beyond the court's constitutional function of interpreting, and not legislating, law. It could also result in the exception consuming the rule. Parties would be left unsure how many items of data could escape without a restrictive legend and still be covered by the legend placed on another item. To be sure, the only result from such an exception would be additional litigation as parties argued about which unlabeled data was covered by which labeled data.

Since plaintiff did not attach the SBIR data rights legend to the PNVG prototypes, no restrictions applied to defendant's use of the prototypes. Defendant was thus within its rights when it shipped the PNVG prototypes to Insight and is therefore entitled to summary judgment on count I.[16]

### B. Was Plaintiff Entitled to a SBIR Phase III Contract?

■ Plaintiff seeks summary judgment while defendant seeks dismissal under RCFC 12(b)(6) on count II, plaintiff's claim that a statutory provision required defendant to award plaintiff a SBIR Phase III contract. Plaintiff argues that 15 U.S.C. § 638(j)(2)(C) operates here to create a contractual entitlement to a SBIR Phase III contract and that the Air Force breached this provision when it decided not to award plaintiff a SBIR Phase III contract. Pl. Mot. Summ. J. 33–34. However, a close examination of plaintiff's arguments reveals § 638(j)(2)(C) creates no contractual obligation for a Phase III as a

---

**15.** *See generally* Richard A. Posner, *The Law and Economics of Contract Interpretation,* 83 Tex. L. Rev. 1581, 1603–04 (2005) ("Generally speaking, contracts seek (1) to assign the risk of some adverse event that would frustrate performance either to the party that can prevent the event at the least cost or, if the event is not preventable at a reasonable cost, to the party that is the superior risk bearer and (2) to prevent either party from taking advantage of vulnerabilities created by nonsimultaneity of performance.").

**16.** While not deciding this issue, it is likely that even if plaintiff had affixed data rights legends to the goggles, or if the notice provided for the technical drawings and documentation could extend to related items like the goggles, defendant would still be entitled to summary judgment because it is doubtful that the goggles constituted "data" eligible for protection under 48 C.F.R. § 252.227–7018(b)(4)(ii). FAR § 52.227–20(a) defines "Data" as used in § 252–2277018 as "recorded information, regardless of form or the media on which it may be recorded." 48 C.F.R. § 52.227–20(a). SBIR data is "data first produced by a Contractor that is a small business firm in performance of [a SBIR] contract." *Id.*

Thus, a tangible product delivered under a contract may indeed constitute the embodiment of data, but it is not itself recorded information. Indeed, expert commentators have opined that "the Government may legitimately provide a sample of a product to another company with full knowledge that it will be 'reverse engineered' to learn how to make a duplicate, even if the government may not provide the technical data associated with the object." Matthew S. Simchak & David A. Vogel, Licensing Software and Technology to the U.S. Government: The Complete Guide to Rights to Intellectual Property in Prime Contracts and Subcontracts 63 (2000); *see also* Christine C. Trend, *Killing the Goose that Laid the Golden Egg: Data Rights Law and Policy in Department of Defense Contracts,* 34 Pub. Cont. L.J. 287, 293 (2005) ("[U]nless the item is covered by a patent, or is otherwise restricted by contract, the Government may use the item to reverse engineer its design or may provide it to a competitor to do the same."). While plaintiff's original complaint included a claim for general patent infringement tied to defendant's distribution of the prototype to Insight, plaintiff withdrew this claim from its amended complaint, relying instead on just its allegation of a SBIR data rights violation.

matter of law and, therefore, the statutory provisions on which plaintiff relies cannot form the grounds of any breach of contract claim in this court. Accordingly, dismissal under 12(b)(6) is only proper.[17]

### 1. The Statutory and Regulatory Guidelines for SBIR Phase III

To properly understand why the plaintiff's claim for a breach of contract fails as a matter of law, a brief examination of the statutory language of 15 U.S.C. § 638 is necessary. To begin with, that section sets out the definition for a SBIR Phase III:

(e) Definitions

. . .

(4) the term "Small Business Innovation Research Program" or "SBIR" means a program under which a portion of a Federal agency's research or research and development effort is reserved for award to small business concerns through a uniform process having-

. . .

(C) where appropriate, a third phase-

(i) in which commercial applications of SBIR-funded research or research and development are funded by non-Federal sources of capital or, for products or services intended for use by the Federal Government, by follow-on non-SBIR Federal funding awards; and

(ii) for which awards from non-SBIR Federal funding sources are used for the continuation of research or research and development that has been competitively selected using peer review or scientific review criteria;

15 U.S.C. § 638(e)(4)(C)(i)-(ii).

The SBIR Phase III contracts are further explained in § 638(r):

(r) Third phase agreements

(1) In general. In the case of a small business concern that is awarded a fund-

ing agreement for the second phase of a SBIR or STTR program, a Federal agency may enter into a third phase agreement with that business concern for additional work to be performed during or after the second phase period. The second phase funding agreement with the small business concern may, at the discretion of the agency awarding the agreement, set out the procedures applicable to third phase agreements with that agency or any other agency.

(2) Definition. In this subsection, the term "third phase agreement" means a follow-on, non-SBIR or non-STTR funded contract as described in paragraph (4)(C) or paragraph (6)(C) of subsection (e) of this section.

15 U.S.C. § 638(r)(1)-(2).

As the plaintiff has noted, § 638 also requires the Small Business Administration ("SBA") Administrator to establish policy directives that provide administrative procedures so that agencies taking part in the SBIR program award follow-on contracts to SBIR-program participants. In relevant part this section provides that:

(j) Small Business Administration policy directives for the general conduct of small business innovation research program

. . .

(2) Modifications. Not later than 90 days after October 28, 1992, the Administrator shall modify the policy directives issued pursuant to this subsection to provide for-

. . .

(C) procedures to ensure, to the extent practicable, that an agency which intends to pursue research, development, or production of a technology developed by a small business concern under a SBIR program enters into follow-on, non-SBIR funding agreements with

---

17. In its opposition to defendant's motion to dismiss, plaintiff claimed for the first time that defendant should be estopped from denying that § 638(j)(2)(C) was incorporated into the parties' Phase II contract. Pl. Mem. Opp'n Summ. J. 11. Because this claim was entirely absent from the amended complaint, as well as plaintiff's moving papers for the motion now being considered, it would be improper for the court to consider plaintiff's estoppel claim. *See Cubic Def. Systs. v. United States,* 45 Fed.Cl. 450, 466–68 (1999) (noting that to permit such a tactic would contravene notice pleading requirements of the modern federal rules of appellate and civil procedure and would condone "litigation by ambush").

the small business concern for such research, development, or production;

15 U.S.C. § 638(j)(2)(C).

Pursuant to this section, the SBA Administrator issued the Small Business Innovation Research Program Policy Directive on January 26, 1993. This Policy Directive was intended to provide guidance to Federal agencies on the general conduct of the SBIR program. *See* Small Business Innovation Research Program Policy Directive, 58 FR 6144–02, 61444 (Jan. 26, 1993). Concerning the SBIR Phase III, the Policy Directive stated:

7. Small Business Innovation Research Program

. . .

(3) Phase III. The term third phase agreement means to follow-on, non-SBIR funded award as described in 1, 2 and 3 below. A federal agency may enter into a third phase agreement with a small business concern for additional work to be performed during or after the second phase period. The second phase funding agreement with the small business concern may, at the discretion of the agency awarding the agreement, set out the procedures applicable to third phase agreements. The competition for Phase I and Phase II awards satisfies any competition requirement of the Competition in Contracting Act.

(a) Where appropriate, there will be a third phase which is funded by:

1. Non-federal sources of capital for commercial applications of SBIR funded research or research and development,

2. The federal government by follow-on non-SBIR awards for SBIR de-

rived products and processes for use by the federal government,

3. Non–SBIR federal sources for the continuation of research or research and development that has been competitively selected using peer review or scientific review criteria.

(b) Agencies which intend to pursue research, research and development or production developed under the SBIR Program will give special acquisition preference including sole source awards to the SBIR company which developed the technology. The Phase III funding agreement will be with non-SBIR funds.

58 FR 6144–02 at 6149.

## 2. Is There a Contractual Obligation for a SBIR Phase III Contract?

Plaintiff argues that § 638(j)(2)(C) was incorporated by operation of law into the parties' Phase II contract and thereby entitled plaintiff to a SBIR Phase III contract given the underlying circumstances, namely plaintiff's successful completion of SBIR Phase I and II obligations. As defendant points out—and is clear from the above cited section—the statute merely directs a government official to establish certain *procedures* to ensure that "follow-on" Phase III contracts will be awarded "*to the extent practicable*." 15 U.S.C. § 638(j)(2)(C) (emphasis added). While § 638(j)(2)(C) clearly directs the SBA Administrator to take action in issuing procedures, nowhere does it impose an obligation directly upon a procuring agency nor does it create any enforceable rights under a SBIR contract.[18] Moreover, the Policy Directive issued by the SBA in January 1993 in accordance with § 638(j)(2)(C) contains no requirements obligating an agency to award a Phase III contract.

---

18. Courts have referred to statutes analogous to § 638(j)(2)(C) as "intergovernmental house-keeping statutes." For example, in *Schism v. United States*, 316 F.3d 1259 (Fed.Cir.2002), the Federal Circuit considered whether 5 U.S.C. § 301 empowered agency officials to promise free lifetime healthcare to war veterans. *Schism*, 316 F.3d at 1279–80. Section 301 provided, in relevant part, "The head of an Executive department or military department may prescribe regulations for the government of his department, the conduct of its employees, the distribution and performance of its business, and the custody, use, and preser-

vation of its records, papers, and property." *Id.* at 1279. The court ruled that § 301 was merely a housekeeping statute authorizing an agency to attend to its day-to-day affairs, but not authorizing it to create a substantive right to free lifetime health care for war veterans. *Id.* at 1278–81; *see also AT & T v. United States*, 307 F.3d 1374, 1377–79 (Fed.Cir.2003) (holding that § 8118 of the Department of Defense Act, Pub.L. No. 100–202, 101 Stat. 1329, 1329–84 (1987), which imposed procedural restrictions on when a fixed-price contract could be used, did not create a cause of action or judicial remedy).

Not only does § 638(j)(2)(C) not impose any contractual obligation to award a Phase III contract, other portions § 638 clearly indicate that such awards are not mandatory.[19] Throughout § 638 the description of procedures for the award of a Phase III is repeatedly qualified with terms such as: *"where appropriate"* in § 638(e)(4)(C); *"may enter into"* in § 638(r)(1); and *"to the extent practicable"* in § 638(j)(2)(C). The plain language of these sections indicates that the awarding of a Phase III contract is not obligatory for the contracting agency, but instead entrusted to a contracting agency's discretion based on the totality of circumstances. Although not controlling when the language of the statute is clear, as is the case here, this conclusion is buttressed by legislative history confirming that SBIR Phase III awards are discretionary. *See* SMALL BUSINESS INNOVATION DEVELOPMENT ACT OF 1982, S. REP. NO. 97–194 at 28 (1981), *reprinted in* 1982 U.S.C.C.A.N. 512, 539 ("The definition of the third phase was changed to clarify the Committee [on Small Business]'s intent that the funding of this phase be discretionary.").

Accordingly, because the provision upon which plaintiff's claim rests creates no contractual obligations, count II must fail as a matter of law and shall be dismissed under RCFC 12(b)(6).

## C. Was There a Breach of an Oral Contract?

The plaintiff alleges that Ms. Demos, the contracting officer who handled NVC's SBIR contracts, made an oral agreement with NVC that the Air Force would award a SBIR Phase III contract if NVC satisfactorily completed the SBIR Phase II contract. Pl. Mem. Opp'n Summ. J. 17–18. In its motion for summary judgment on this issue, defendant argues that no such agreement existed as a matter of fact, and that even if it did it would not be enforceable here as a matter of law. D. Mot. Summ. J. 15–17.

To establish the existence of an oral, implied-in-fact contract, a plaintiff has the burden of proffering evidence establishing four criteria, the very same criteria needed to demonstrate an express contract: (1) mutuality of intent to contract, (2) lack of ambiguity in offer and acceptance, (3) consideration, and (4) actual authority of the government representative whose conduct is relied upon to bind the government in contract. *Trauma Serv. Group v. United States*, 104 F.3d 1321, 1325 (Fed.Cir.1997); *Lewis v. United States*, 70 F.3d 597 (Fed.

19. Plaintiff's argument that § 638(j)(2)(C) was incorporated into its SBIR contracts under the "Christian" doctrine fails for the fundamental reason that § 638(j)(2)(C) offers nothing to incorporate. "Under the Christian doctrine, a mandatory contract clause that expresses a significant or deeply ingrained strand of public procurement policy is considered to be included in a contract by operation of law." *S.J. Amoroso Const. Co. v. United States*, 12 F.3d 1072, 1075 (Fed.Cir.1993) (citing *G.L. Christian & Assocs. v. United States*, 160 Ct.Cl. 1, 312 F.2d 418 (1963), *aff'd on reh'g*, 160 Ct.Cl. 58, 320 F.2d 345 (1963)). The Christian Doctrine seeks to ensure that "procurement policies set by higher authority not be avoided or evaded (deliberately or negligently) by lesser officials" and prevent "ad hoc encroachment or dispensation by the executive" of "dominant legislative policy." *Christian*, 320 F.2d at 351. In this instance, however, the statute plaintiff seeks to incorporate is not a contract clause at all, let alone a "mandatory contract clause" as contemplated by the Christian doctrine. On the contrary, § 638(j)(2)(C) merely directs the Administrator to establish certain *procedures* to ensure that "follow-on" SBIR contracts will be awarded "to the extent practicable." Thus, § 638(j)(2)(C) is not mandatory in the sense that it must be incorporated into all government contracts or even all SBIR contracts. Moreover, plaintiff has not persuaded the court that § 638(j)(2)(C) expresses a "significant or deeply ingrained strand of public procurement policy." *Amoroso*, 12 F.3d at 1075. It appears that § 638(j)(2)(C) has no more significance than any other routine provision directing an agency to establish a framework to administer a federal program.

The same may be said for plaintiff's argument that § 638(j)(2)(C) should be incorporated into the parties' SBIR Phase II contract under the more general rule that law existing at the time of contract formation forms a part of the contract itself. It is beyond doubt that, "[t]he law in effect when a Government contract is made becomes part of the contract." *Jackson v. United States*, [216 Ct.Cl. 25,] 573 F.2d 1189, 1195 (Ct. Cl.1978). Nevertheless, this general principle only goes so far. Implicit in this rule is the requirement that the law sought to be incorporated is relevant—that it contains provisions relating to the formation or performance of the contract and thus imposes a particular duty or obligation on one or both of the parties. Here § 638(j)(2)(C) is irrelevant to the contractual disputes of this case since it imposes no duty to award a SBIR Phase III contract.

Cir.1995); *City of El Centro v. United States*, 922 F.2d 816, 820 (Fed.Cir.1990). It is the responsibility of those entering into an agreement with the government to make sure that the specific government representative they deal with is acting within the bounds of his authority. *Fed. Crop Ins. Corp. v. Merrill*, 332 U.S. 380, 384, 68 S.Ct. 1, 92 L.Ed. 10 (1947); *Flexfab, L.L.C. v. United States*, 424 F.3d 1254, 1259–60 (Fed. Cir.2005).

■ Examining the last criterion first, the court finds plaintiff's claim deficient because it has not demonstrated the existence of actual authority by any agent representing the government to bind the United States to the alleged oral contract, regardless of whether plaintiff has established the existence of an oral promise for the Phase III contract. (The court, to be sure, also believes that plaintiff has wholly failed to ascertain even a debatable existence of an oral promise to award a Phase III contract). Indeed, the failure to establish actual government authority by itself is enough to defeat plaintiff's breach of oral contract claim. *See Trauma Serv. Group*, 104 F.3d at 1325; *City of El Centro*, 922 F.2d at 820. *See also Flexfab*, 424 F.3d 1254, 1259–60.

Plaintiff explicitly states that it is the representations of Ms. Demos, the contracting officer, upon which the oral contract claim lies. *See* Pl. Mem. Opp'n Summ. J. 17–18. In its motion for summary judgment, however, defendant has challenged that there is an absence of evidence tending to show that any representations were made in this case, or that they were made by an agent with contracting authority.

Defendant presented the deposition testimony of Ms. Demos, herself, in which she flatly denied "that someone promised NVC a [Phase III] contract" and stated that there "is never a guarantee within the government" that a Phase III contract will necessarily flow from the successful completion of a Phase II contract. D.App. 107, 137. Likewise, Ms. Demos did not know of anyone "who made a guarantee that we would go to Phase III" with NVC and did not recall "anyone ever saying that they thought that." *Id.* at 107, 137.

Similarly, the contracting officer that succeeded Ms. Demos on plaintiff's SBIR contracts, Ms. Jones, also denied "that someone promised NVC a [Phase III] contract" and did not recall hearing "anyone ever saying that they thought that." *Id.* at 107.

These denials by the defendant's witnesses are supported by the Teaming Agreement signed by NVC and Insight in the presence of Air Force personnel at a July 9, 1998 meeting. Pl.App. Ex. 91. In that Teaming Agreement, the parties agreed that Insight would manufacture parts for NVC's "if phase II leads to a phase III award." *Id.* These terms of the agreement make it clear that NVC knew that a phase III award was not guaranteed.

Essentially, defendant has presented the court with testimonial evidence of the type contemplated by RCFC 56 that tends to undermine an essential element of plaintiff's claim—namely, that any government agent with contracting authority entered into the type of agreement that plaintiff alleges. Without evidence of a specific agreement made by a specific government agent, it seems plaintiff would fail in its burden to establish several of the jurisdictional predicates of an express or implied-in-fact contract claim, including mutuality of intent to contract, lack of ambiguity in offer and acceptance, and actual authority of the government agent. *See, e.g., Trauma Serv. Group*, 104 F.3d at 1325. Accordingly, defendant has borne the "initial responsibility of informing the ... court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323, 106 S.Ct. 2548.

When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genu-

ine issue for trial. If the adverse party does not respond, summary judgment, if appropriate, shall be entered against the adverse party. RCFC 56(e).

In response to defendant's motion, plaintiff relies primarily on three portions of the record to refute defendant's assertions, or at least create an issue of triable fact on this issue. However, none of these snippets of the record go so far as to establish plaintiff's position or create an issue of fact for trial that might render awarding summary judgment to defendant improper.

First, plaintiff points to the affidavit provided by Mr. Filipovich, which notes that "[p]rior to April 1998, the Air Force had repeatedly assured NVC that, if SBIR Phase II was successful, then a SBIR Phase III award to NVC would follow. NVC was also assured that if SBIR Phase II were successful, then the Air Force would purchase at least 7,000 PNVG I systems." Pl.App. Ex. A ¶ 38. The problem in relying on this statement is that it is far too general and vague to satisfy plaintiff's burden of establishing that an oral agreement was entered into on behalf of the government by an agent that had proper contracting authority. *Litton Indus. Prods., Inc. v. Solid State Systs. Corp.*, 755 F.2d 158, 164 (Fed.Cir.1985) ("[M]ere allegations by declaration or otherwise do not raise issues of fact needed to defeat a motion for summary judgment."); *Doe v. United States*, 58 Fed.Cl. 479, 483 (2003) ("Although Plaintiff has stated in his affidavit that he had an oral contract ... that bare assertion is not sufficient to create a genuine issue of material fact...."). To be sure, Mr. Filipovich fails to identify a specific individual, a specific agreement, or any of the other details that might create an issue of fact regarding the statements that Ms. Demos and Ms. Jones made in their depositions. *Doe*, 58 Fed.Cl. at 483 ("[S]elf-serving affidavits without factual support in the record will not defeat a motion for summary judgment.") (quoting *Shank v. William R. Hague, Inc.*, 192 F.3d 675, 682 (7th Cir.1999)).

Second, plaintiff relies on deposition statements by Mr. Karacic, an owner and principal of NVC, that describe what he believed to be "guarantees" of a Phase III award. But these statements fall short of the mark because the types of statements upon which Mr. Karacic relied as "guarantees" fall far short of the definitive kind of statement that might give rise to an oral contract. In his deposition, Mr. Karacic engaged in the following exchange:

Q. Did the Air Force ever guarantee to anyone at Night Vision that there would be a SBIR Phase III award?

A. Oh yes.

Q. And who made that guarantee?

. . .

A. [Among others,] Judy Demos ....

Q. Did they make those statements—

A. Continuously, repeatedly.

. . .

Q. Okay. Let me just ask you this: So your testimony as I understand it is that there are documents in the record that would reflect a guarantee from the Air Force to Night Vision of a SBIR Phase III award?

A. When you say the word "guarantee," I don't know if the word "guarantee" can be extracted from the document, but the documents will recite "when we are in a Phase III," "when we are doing a Phase III," "when we are working for a Phase III." What does that tell you?

Q. Do you believe those constitute a guarantee?

A. Oh, yes. I believe that the—yes, very much so....

Q. Do you know if there were any oral statements made by the Air Force either to yourself or anyone else at Night Vision, including Mr. Filipovich, in which the Air Force guaranteed that there would be a SBIR Phase III award to Night Vision Corporation?

A. Yes.

Q. Can you tell me about those oral statements?

A. There were several meetings where they would say, "When you're in Phase III," "When we have Phase III." And then we would discuss funding of Phase III. All

of this would have been irrelevant if we weren't talking about a Phase III.

Q. And it's your testimony that those statements constitute guarantees by the Air Force to Night Vision Corporation?

A. Yes. Yes. As they would to any layperson.

Pl.App. Ex. J at 157–59 (Deposition of Thomas J. Karacic).

As Mr. Karacic's testimony makes abundantly clear, the types of specific statements that he recalled as giving rise to the "guarantees" upon which plaintiff relies were really nothing more than statements of planning. The fact that the parties may have been optimistic at the time about the prospect of a Phase III award and discussed the types of activities that might be required if and when NVC was performing under a Phase III contract does not rise to the dignity of the type of assurance that a Phase III contract would necessarily be awarded as a matter of course. Even if the court were to attribute to Ms. Dernos all of the statements to which Mr. Karacic referred in his deposition, those statements are not inconsistent with and do not call in to question the statement that Ms. Demos made in her deposition that she did not promise plaintiff a Phase III award. Accordingly, Mr. Karacic's deposition testimony is insufficient to create an issue of fact regarding whether the Air Force ever entered into a binding oral contract or made binding oral promises to plaintiff that a Phase III contract would definitely be awarded.[20] To hold otherwise is to mangle the obvious import of the proffered deposition testimony, something the court is not required to do even when giving plaintiff the benefit of the doubt as the nonmoving party. *See Celotex*, 477 U.S. at 324, 106 S.Ct. 2548. Simply put, plaintiff has failed its burden at this stage of the summary judgment proceeding to respond to defendant's allegations with cogent evidence. *Id.*

Finally, plaintiff relies on notes from a meeting with NVC on August 27, 1999, taken by Ms. Jones. Pl.App. Ex. 277. Under the heading "NVC's PURPOSE" Ms. Jones summarized the arguments NVC presented at the meeting as: " 'Sob Story' company is going under and it is the Government's fault because NVC (I think) has been promised a Phase III somewhere along the way. Now the Government is telling NVC we are not sure if that is in the strategy." *Id.* Regarding Air Force Counsel Debbie Muldoon's reaction to the meeting, the notes state: "She got the same feeling I did from the meeting and that is she thinks we have promised NVC a Phase III proposal somewhere along the way." *Id.*

The statements in these notes might seem to get plaintiff closer to defeating summary judgment because taken in isolation they seem to raise an inference to some sort of promise being made by government employees. The problem, however, is that defendant has *specifically* challenged plaintiff's failure to establish that an agent with contracting authority was the source of any of the myriad "promises" of a Phase III award that plaintiff alleges. While Ms. Jones' meeting notes might signal the existence of some nebulous promise, this evidence provides absolutely no information that tends to rebut defendant's argument or Ms. Demos' and Ms. Jones' deposition statements. Simply put, the notes are not sufficient to overcome plaintiff's Rule 56 and *Celotex* burdens of presenting the court with information that might give rise to a genuine issue of material fact on this issue.

And critical to the court's determination is that even if plaintiff could produce adequate evidence demonstrating the existence of specific oral promises, such promises would have been ineffectual because applicable agency regulations were not complied with. The net result of this dooms plaintiff's claim because it necessarily means a lack of contracting authority. "[A]gency procedures must be followed before a binding contract can be formed." *Harbert/Lummus Agrifuels Projects v. United States*, 142 F.3d 1429, 1433 (Fed.Cir.1998). "Oral assurances do not pro-

---

**20.** Even Mr. Karacic himself seemed to concede this. He noted in his deposition that NVC was preparing to submit a Phase III proposal as late as April 1999, his earlier comments about having already been "guaranteed" the Phase III award notwithstanding. Pl.App. Ex. J at 276. NVC did not, however, ever submit a Phase III proposal. *Id.*

duce a contract implied-in-fact until all the steps have been taken that the agency procedure requires; until then, there is no intent to be bound. Thus, it is irrelevant if the oral assurances emanate from the very official who will have authority at the proper time, to sign the contract or grant." *New Am. Shipbuilders, Inc. v. United States,* 871 F.2d 1077, 1080 (Fed.Cir.1989); *American Gen. Leasing, Inc. v. United States,* 218 Ct.Cl. 367, 587 F.2d 54, 57–58 (1978) (holding that express oral agreement with government agent was not binding because, among other factors, applicable regulations required contract to be in writing).

In this instance, both the SBIR statute and the FAR require more than simple oral agreements for a SBIR Phase III contract. The SBIR statute directs procuring agencies to award SBIR contracts through "solicitations," and upon review of "SBIR proposals." 15 U.S.C. § 638(g). Under the FAR all contracts "except as otherwise authorized" must be "in writing." Federal Acquisition Regulations, 48 C.F.R. § 2.101 (2005). The very nature of the plaintiff's claim concedes that these procedures were not followed. Simply put, it is uncontroverted that plaintiff never submitted a SBIR Phase III proposal for defendant to evaluate, and plaintiff has produced no evidence tending to demonstrate the existence of a written agreement. Without some indication that these required procedures were followed, any oral promises of a Phase III award—even assuming the existence of such promises (a proposition which plaintiff has not demonstrated)—would be unenforceable.

Consequently, because plaintiff has failed to demonstrate that it acted upon the representations of a government agent that had actual contract authority, defendant's motion for summary judgment on the breach of oral contract claim must be granted.[21]

## D. Has Plaintiff Properly Pled or Demonstrated a Breach of the Duty of Good Faith and Fair Dealing?

■ Plaintiff argues that if the court finds that there was no contract, the court should grant it summary judgment on count IV, the duty of good faith and fair dealing claim. The court notes that this count, in addition to plaintiff's bid protest count discussed subsequently, is predicated upon what plaintiff terms the clear fact that "the Air Force violated its implied duty of good faith and fair dealing by unreasonably denying a sole source phase III award to NVC." Pl. Am.

21. As an additional ground for summary judgment, defendant argues that there is no evidence of consideration for an oral agreement to award a Phase III contract. In response, plaintiff essentially points to the affidavit of Mr. Filipovich in which he alleges that NVC performed above and beyond the performance requirements of the Phase II contract in expectation or anticipation of receiving a Phase III contract. The court agrees with defendant that Mr. Filipovich's statements are so ambiguous that its presentation does not meet plaintiff's burden in responding to defendant's summary judgment motion with concrete evidence that would create an issue of fact as to the existence of consideration for an oral contract. *See Litton Indus. Prods., Inc.,* 755 F.2d at 164; *Doe,* 58 Fed.Cl. at 484 (granting summary judgment because plaintiff presented no evidence to support his affidavit's claim that he had an oral contract with the government). Plaintiff has failed to identify any specific facts in the record which would support its allegation that it invested additional sums of money or any evidence which indicates how much additional money was spent on the project, or for what in particular purposes these additional expenditures were used.

To be sure, Mr. Filipovich's assertions regarding plaintiff's performance under Phase II runs counter to the black letter law that "[p]erformance of a pre-existing legal duty is not consideration." *Gardiner, Kamya & Assocs., P.C. v. Jackson,* 369 F.3d 1318, 1322 (Fed.Cir.2004); *Sinclair v. United States,* 56 Fed.Cl. 270, 278 (2003); *see* RESTATEMENT (SECOND) OF CONTRACTS § 73 (1981). Under the SBIR Phase II contract, plaintiff received funding from the defendant in exchange for the delivery of technical drawing and prototype goggles. This was the essence of the plaintiff's bargain. Mr. Filipovich's testimony seems to indicate that plaintiff expended more money than necessary during the SBIR Phase II in anticipation of a Phase III award. Mr. Filipovich's testimony, however, fails to address how the defendant was benefited in any way by these alleged additional expenditures. Based on the evidence presented by plaintiff, it would seem that defendant promised to award a SBIR Phase III in exchange for the performance of plaintiff's SBIR Phase II obligations. There is a dearth of evidence, however, indicating plaintiff conferred any benefit on defendant that differed from what was required by the Phase II contract in a way which reflects more than a pretense of bargain. Therefore, consideration for any alleged binding promise was lacking.

Compl. ¶ 111. According to plaintiff, the breach of the implied duty to of good faith and fair dealing does not have to arise from specific provisions of a contract, or even from a bid protest, but instead may have its genesis in a "legitimate expectation" of receiving a contract. Pl. Mem. Opp'n Summ. J. 22. To plaintiff, because it was a "contracting partner" with the Air Force in the Phase II contract, it was entitled "to receive a sole source Phase III award" "particularly in light of the SBIR Laws." *Id.*

Defendant, on the other hand, seeks dismissal under RCFC 12(b)(6) on the basis that the duty of good faith and fair dealing applies only to specified contractual obligations, while plaintiff's claim assumes there was no particular contractual obligation to award a SBIR Phase III contract. D. Mot. Summ. J. 17–18. Defendant also argues that the Air Force's decisions (both against awarding a Phase III contract to NVC and for awarding contract no. F33615–00–C–6000 to Insight) were well-founded, not the result of bad faith. *Id.*

Looking at the facts alleged in the plaintiff's complaint, it is clear that it does not state a cognizable claim and that defendant's 12(b)(6) motion should therefore be granted. Dismissal under Rule 12(b)(6) "is proper only when a plaintiff 'can prove no set of facts in support of his claim which would entitle him to relief,' " *Adams v. United States*, 391 F.3d 1212, 1218 (Fed.Cir.2004) (quoting *Leider v. United States*, 301 F.3d 1290, 1295 (Fed.Cir. 2002)), and this plaintiff has not done.

While plaintiff is indisputably correct that the government has a duty of fair dealing in the procurement process, *see, e.g., Emery Worldwide Airlines, Inc. v. United States*, 264 F.3d 1071, 1078–80 (Fed.Cir.2001); *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1331–1332 (Fed.Cir.2001), and that the government is required to conduct its business honestly and fairly with both its contracting and prospective contracting partners, *see* Federal Acquisition Regulation, 48 C.F.R. § 1.102–2(c), (c)(3) (2005) (government required to "[c]onduct business with integrity, fairness, and openness ... and comply with applicable laws and regulations in dealing with contrac-

tors and prospective contractors"), plaintiff is on shaky ground when it argues that the government breached its duty of good faith and fair dealing arising from plaintiff's "legitimate expectation" of receiving a contract—allegedly here the Phase III contract. Surely, what plaintiff is attempting is to dress a wolf in sheep's clothing. To be sure, at its heart this contention is nothing more than the rejected arguments that either, or both, the statutory scheme or the successful completion of the Phase II contract mandate the award of the Phase III contract to plaintiff.

Plaintiff's citation to *Temple–Inland, Inc. v. United States*, 59 Fed.Cl. 550, 559–60 (2004) for the proposition that "the government implicitly promises that it will not use its power to destroy the legitimate expectations of its contracting partners," is inapposite. Pl. Mem. Opp'n Summ. J. 22. That case involved the government's breach of the implied covenant of good faith and fair dealing in a thrift bailout agreement when Congress enacted the so-called Guarini legislation in 1993, which retroactively eliminated the tax deduction for covered asset losses and, thus, in part, vitiated the benefits provided by the thrift agreement. In *Temple–Inland*, this court addressed the covenant in the context of a duty "not to act so as to destroy the reasonable expectations of the other party regarding the fruits of the contract." *Centex Corp. & CTX Holding Co. v. United States*, 395 F.3d 1283, 1304 (Fed.Cir. 2005). This implied covenant thus prevents the government from targeting its contracting partners' reasonable expectations, including when it acts in its capacity as a sovereign. *See Yankee Atomic Elec. Co. v. United States*, 112 F.3d 1569, 1575 (Fed.Cir.1997) ("The Government-as-contractor cannot exercise the power of its twin, the Government-as-sovereign, for the purpose of altering, modifying, obstructing or violating the particular contracts into which it had entered with private parties."). Clearly, the case has at its predicate the existence of a valid, mutually assented-to contract, for which a covenant arises that proscribes the government from interfering with reasonable expectations flowing from that particular contract.

Accordingly, Plaintiff Night Vision's argument of "reasonable expectation" must be based upon a right or entitlement to a Phase III contract founded on a pre-existing contract or statutory right. For the covenant to be breached, there must first be a trigger to the duty of good faith performance. Since there was no contract, express or implied, that required an award of a Phase III contract, and the SBIR statutory and administrative scheme did not automatically award such a contract to plaintiff even if it successfully completed Phase II, plaintiff's claim here must necessarily fall.

Illustrative of the over-all point of law is *Alaska v. United States*, 35 Fed.Cl. 685, 704 (1996). In that case, the State of Alaska argued that the legislation granting it statehood in 1959 created a contract between the state and the federal government. The language which Alaska argued gave rise to a contractual relationship was implied in a portion of the statehood legislation that amended the Mineral Leasing Act 30, increasing Alaska's mineral leasing revenue amount by 52.5%. U.S.C. § 187 *et seq.* (1994) ("MLA"). Alaska argued that the amendment created an implied contract under which there was an implied duty of good faith and fair dealing on the part of the government to maximize revenue from the federally held lands. *Alaska*, 35 Fed.Cl. at 704. This obligation, Alaska claimed, was violated when the federal government refused to exploit the Arctic National Wildlife Refuge ("ANWR"). *Id.* The court disagreed, noting that amendment to the MLA was not a substantive obligation, mutually agreed to by the parties. *Id.* at 704. The court found that Alaska's reasoning "would have the implied duty of good faith and fair dealing create by implication an express obligation to open up specific federal lands to generate additional revenue for the States. There is no such express substantive obligation in [the amendment]." *Id.* at 704–05.

Plaintiff makes essentially the same mistaken argument as did the State of Alaska. To the extent plaintiff argues that the government violated the covenant of good faith and fair dealing, plaintiff fails to show the existence of a contract, let alone the precise contractual terms to which the covenant attached. Plaintiff alleges that defendant "was bound by a duty of good faith and fair dealing to treat [plaintiff] fairly in all facets of the procurement process" and that by "unreasonably denying" a SBIR Phase III contract to plaintiff, defendant violated this duty. *Id.* Beyond these *ipse dixit* allegations, plaintiff's arguments in favor of its good faith and fair dealing claim make no mention of any particular contractual obligation or statutory scheme that defendant allegedly breached. On the contrary, it is abundantly clear that plaintiff's claim relates to its unilateral expectation regarding future contracts that it hoped to obtain—an expectation not an entitlement mandated by statute or provided by contract.

There exists no substantive provision in any prior contract, mutually assented to by the parties, statute, or regulation, obligating the government to award or even consider the plaintiff for a SBIR Phase III. Just as in *Alaska* where there was nothing in the amendment specific to ANWR, there is nothing that exists which specifies that a SBIR Phase III must be awarded to plaintiff. Plaintiff "is simply shoe-horning an obligation by the government to" award a SBIR Phase III "into a contract where neither the text nor the intent of the parties supports it." *Franklin Sav. Corp. v. United States*, 56 Fed.Cl. 720, 743–45 (2003). Although the obligation of good faith and fair dealing is a real one, it is not a catch-all, whereby plaintiff can retroactively insert specific obligations into an otherwise silent contract. To hold otherwise "would allow the covenant of good faith and fair dealing to supplant specific terms of the contract." *Id.* at 745.

Because plaintiff does not allege that defendant violated its duty of good faith and fair dealing with respect to any specific obligation imposed by the parties' contracts, or, as demonstrated above, shown that a statute or regulation required the award of the Phase III contract, plaintiff has failed to state a claim for which relief can be granted. The court thus dismisses count IV of the complaint pursuant to RCFC 12(b)(6).

## E. Bid Protest[22]

Finally, defendant seeks judgment on the administrative record on count V, the bid protest count. In the bid protest, plaintiff generally alleges that (1) NVC's proposal should have been ranked first and (2) Insight's proposal should not have been ranked first. As a result, plaintiff contends the evaluation of the proposals were arbitrary and capricious. Pl. Am. Compl. ¶¶ 115–117. Defendant argues both that plaintiff cannot prove prejudice (because NVC's bid was beyond the zone of active consideration) and that plaintiff cannot produce evidence that the Air Force abused its discretion in awarding the contract to Insight. D. Mot. Summ. J. 18–22. The court agrees with defendant's arguments.

Rule 56.1 of the Rules of the Court of Federal Claims (RCFC) provides for judgment on the administrative record, which is a procedural tool unique to the Court of Federal Claims with no counterpart in the Federal Rules of Civil Procedure. *Banknote Corp. of America, Inc. v. United States,* 365 F.3d 1345, 1352 (Fed.Cir.2004); *but see* Court of International Trade Rule 56.1. "RCFC 56.1 sets forth the standard by which the court reviews factual determinations in a judgment on the administrative record." *Bannum, Inc. v. United States,* 404 F.3d 1346, 1353 (Fed.Cir.2005). RCFC 56.1 is "a rule designed to provide for trial on a paper record, allowing fact-finding by the trial court." *Id.* at 1356. In particular, RCFC 56.1 does not incorporate any basis for denying judgment based on a genuine issue of material fact or for drawing inferences in favor of the non-moving party. *Id.* Instead, the rule requires this court to make factual findings based on the record before it and make decisions in light of those factual findings. *Id.* at 1354.

### 1. Was the Evaluation of Plaintiff's Proposal Arbitrary and Capricious?

Once the court is satisfied that a plaintiff has standing to bring a bid protest, "[a] bid protest proceeds in two steps." *Bannum,* 404 F.3d at 1351. First, the court must determine whether defendant's evaluation of plaintiff's proposal was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *Bannum,* 404 F.3d at 1351. Second, and only if the court finds the defendant violated 5 U.S.C. § 706(2)(A), the court must "determine, as a factual matter, if the bid protester was prejudiced by that conduct." *Id.* Before proceeding with this analysis, it is important for this court to examine the standing of the plaintiff to bring the bid protest.

### a. Is There Injury–in–Fact Standing?

Standing is a threshold jurisdictional issue and one the Federal Circuit has repeatedly stressed must be determined at the outset in bid protest cases. *Info. Tech. & Applications Corp. v. United States,* 316 F.3d 1312, 1319 (Fed.Cir.2003); *Myers Investigative & Sec. Servs., Inc., v. United States,* 275 F.3d 1366, 1369 (Fed.Cir.2002). The party invoking federal jurisdiction bears the burden of establishing standing. *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 561, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992); *Rothe Dev. Corp. v. Dep't of Def.,* 413 F.3d 1327, 1334 (Fed.Cir.2005). In bid protests, standing "is limited to actual or prospective bidders or offerors whose direct economic interest would be affected by the award of the contract or by failure to award the contract." *Am. Fed'n of Gov't Employees v. United States,* 258 F.3d 1294, 1302 (Fed.Cir.2001). For its "direct economic interest" to be affected, the protestor must show that it was prejudiced by the award. *Info. Tech.,* 316 F.3d at 1319; *Myers,* 275 F.3d at 1370 ("prejudice (or injury) is a necessary element of standing"). To establish prejudice the protestor must have had a substantial chance of obtaining the contract, assuming that the protester's substantive allegations bear out. *Id.*

Since the need to establish standing is not a mere pleading requirement "but rather an indispensable part of the plaintiff's case, each element must be supported in the same way as any other matter on which the plaintiff

---

22. Facts for this section are derived from exhibits in the Administrative Record ("AR"), Defendant's Statement of Facts for Count V ("D.SF"), and Plaintiff's Counter–Statement of Facts for Count V ("Pl.CSF").

bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of the litigation." *Lujan*, 504 U.S. at 561, 112 S.Ct. 2130. In the case of judgment on the administrative record, there must be facts in the record that demonstrate that plaintiff had a substantial chance of obtaining the contract. *Compare Impresa*, 238 F.3d at 1334 (finding standing because, assuming the bid protest was successful, the protestor could compete for the contract), *with Fed. Data Corp. v. United States*, 911 F.2d 699 (Fed.Cir.1990) (finding no standing because a bidder withdrew from the procurement, and assuming the bid protest was successful, the award would go to another party), *and United States v. Int'l Bus. Machs. Corp.*, 892 F.2d 1006 (Fed.Cir. 1989) (finding no standing because a bidder was rated below second place, and assuming the bid protest challenging the ranking of the first place bidder was successful, the award would go to another party), *and MCI Telecomms. Corp. v. United States*, 878 F.2d 362 (Fed.Cir.1989) (finding no standing because the protestor did not submit a proposal for the bid, and assuming the bid protest was successful, the award would go to another party). This initial evaluation of the administrative record is only to determine if there are sufficient facts in the record to establish standing—it does not include weighing facts and making substantive determinations on the merits. *Media Techs. Licensing, LLC v. Upper Deck Co.*, 334 F.3d 1366, 1370 (Fed. Cir.2003) ("Because standing is jurisdictional, lack of standing precludes a ruling on the merits.").

In this case the administrative record shows the minimum requisite evidence necessary for plaintiff to demonstrate prejudice and therefore standing with respect to its claim that defendant improperly ranked plaintiff's bid too low. The Air Force Research Laboratory ("AFRL") posted Program Research and Development Announcement ("PRDA") No. 00–01–HE on December 16, 1999. AR Ex. 34. The purpose of the PRDA was "to award a negotiated, 24–month Advanced Technology Demonstration ('ATD') contract" for what the Air Force called Integrated Panoramic Night Vision Goggles ("IPNVG"). *Id.* Three companies submitted bids in response to the PRDA: NVC, Insight, and Litton. Pl. CSF ¶ 10. On March 22, 2000, following technical evaluations of the proposals, the evaluation team ranked Insight first, based upon technical merit, followed by Litton. NVC's proposal was ranked as "Category III" and ineligible for award, because it did not meet agency needs. *Id.* Since the plaintiff alleges that it was unreasonably denied the first ranking, assuming plaintiff's bid protest is successful, plaintiff would be prejudiced and would have a substantial chance at being awarded the contract.[23] *See Info. Tech.*, 316 F.3d at 1319 (protestor established standing "because it has a greater than an insubstantial chance of securing the contract if successful on the merits of the bid protest").

### b. Was the Evaluation Arbitrary and Capricious?

■ Since plaintiff has standing to challenge defendant's evaluation of its proposal, the court must next determine whether that evaluation violated the APA. In the procurement process, "contracting officers are 'entitled to exercise discretion upon a broad range of issues confronting them.'" *Impresa*, 238 F.3d at 1332 (quoting *Latecoere Int'l, Inc. v. United States Dep't of Navy*, 19 F.3d 1342, 1356 (11th Cir.1994)). The court looks to see whether "the contracting agency provided a coherent and reasonable explanation of its exercise of discretion." *Id.* Under this review, the plaintiff "bears a 'heavy burden' of showing that the award decision 'had no

---

**23.** This limited review for prejudice in standing is in keeping with the U.S. Supreme Court's notions of what is necessary for a plaintiff to establish standing:

When the suit is one challenging the legality of government action or inaction, the nature and extent of facts that must be averred (at the summary judgment stage) or proved (at the trial stage) in order to establish standing depends considerably upon whether the plaintiff is himself an object of the action (or forgone action) at issue. If he is, *there is ordinarily little question* that the action or inaction has caused him injury, and that a judgment preventing or requiring the action will redress it. *Lujan*, 504 U.S. at 561–62, 112 S.Ct. 2130 (emphasis added).

rational basis.'" *Id.* 1333 (quoting *Saratoga Dev. Corp. v. United States,* 21 F.3d 445, 456 (D.C.Cir.1994)).

Reviewing the administrative record, the court notes that through the PRDA, the AFRL was seeking the development of:

> innovative NVG system(s)[,] for both fixed wing and rotorcraft aircraft as well as ground personnel[,] that addresses wide field-of-view, laser eye protection, fit/comfort, image quality, integrated symbology/imagery display, field support, ejection/crash/ground egress safety, compatibility with existing systems, supportability, maintainability, producibility[,] reliability, and affordability.

Pl. CSF ¶ 2. The PRDA instructed bidders to submit a proposed statement of work, description of the proposed technical approach, information regarding the bidder's management and production capabilities, resumés of technical personnel, and a separate cost/business proposal. *Id.* ¶ 3.

The evaluation factors were technical merit (the highest priority); cost/price, including reasonableness and realism (a secondary priority); and an assessment of project risk versus the potential rewards. *Id.* ¶ 4. Technical merit included, in descending order of importance, (a) soundness of approach; (b) availability of qualified personnel and experience; (c) understanding of the problem; and (d) the use of new and creative solutions. *Id.* The announcement advised that "[n]o other evaluation criteria will be used." *Id.*

In a letter dated January 28, 2000, Ms. Jones informed potential bidders that the "Air Force is not looking for a copy of the PNVG as designed under the previous [SBIR] contracts[,] which is why we have elected to issue a [PRDA, which] encourages industry to propose new and creative solutions." *Id.* ¶ 7.

NVC, Insight, and Litton submitted bids in response to the PRDA. *Id.* ¶ 10. On March 22, 2000, following technical evaluations of the proposals, the evaluation team ranked Insight first, based upon technical merit, followed by Litton. NVC's proposal was ranked as "Category III" ineligible for award, because it did not meet agency needs. *Id.*

Regarding the "Soundness of Offeror's Technical Approach," describing plaintiff's technical merit (the primary evaluation factor), the technical evaluation team stated that plaintiff's "optical approach to achieve a 90 [degree] horizontal field of view is good" and "image quality trade-offs for FOV/resolution were well-developed." AR Ex. 96 at 969. However, the technical evaluation team concluded that plaintiff's "overall technical approach is not sound." *Id.* Specifically, the technical evaluation team noted that "NVC's proposal frequently states a problem as identified in the PRDA and that they plan to fix it, but without any approach to accomplish this" and that "most PRDA parameters are stated as 'will-dos' with minimal discussion of the trade-offs to be considered." *Id.* The technical approach portion of the evaluation also noted other deficiencies including "minimal discussion of '—ilities' [i.e., supportability, maintainability, producibility, reliability, and affordability] with absolutely no discussion of producibility or manufacturability." *Id.* In summary of this part, the evaluation states: "The overall proposal is very weak and many technical parameters are not addressed." *Id.* at 970.

Regarding the "Availability of Qualified Technical Personnel and their Experience," the evaluation states that plaintiff "has three employees/consultants that have a good background on development and design" relevant to its proposal. *Id.* However, the evaluation stated that plaintiff "did not provide resumés for the mechanical engineer, quality assurance engineer, assembly technician or program manager" and stated that due to this deficiency "it is not clear that [plaintiff] can support the full scope of the program." *Id.*

Regarding the "Understanding of the Problem" aspect of the bid, the technical evaluation team summarized its comments by stating: "NVC has previously developed and demonstrated an understanding of the complex issues pertaining to folded optic NVG designs." However, "NVC's proposal did not address the majority of PRDA technical parameters in any detail to substantiate understanding of those areas." *Id.*

The overall summary of the evaluation regarding NVC's bid concluded: "NVC's proposal is very weak and did not address many of the technical areas necessary to fully detail their selected approach to the problems set forth in the PRDA. The majority of the program team has not been identified and there is no supporting documentation from any of the subcontractors, showing cost or commitment to perform." *Id.* at 971. "Therefore," the evaluation concluded, "NVC's proposal does not meet agency needs." *Id.* On this basis, the Air Force concluded that plaintiff's proposal "[did] not meet the subject announcement requirement" and "[would] not be considered for further award." AR Ex. 107 at 986.

The record before the court seems to adequately support the agency's conclusions that plaintiff's proposal was strikingly incomplete and inadequate to merit meaningful consideration in the procurement process. Plaintiff's proposal repeatedly asserted that it would solve identified problems, but unlike the other proposals defendant received, plaintiff's failed to explain *how* those problems would be overcome. For example, under almost every sub-point in "6.0 Safety of Flight" section of plaintiff's proposal, the plaintiff stated "the PNVG system shall be fully compatible with" requirements with no other specifics. AR Ex. 83 at 466–69. Similarly, plaintiff's proposal failed to provide information on who, if anyone, would fill significant technical and production capabilities. Especially considering that plaintiff's organization lacked any direct manufacturing capability, and the subject contract called for a production requirement, the failure to adequately describe productability and manufacturability was particularly glaring. In light of these relevant facts, the agency's decision to rank plaintiff's proposal as "Category III" and ineligible for award seems both justified and appropriate.

Responding to these facts, plaintiff does not discuss specific aspects of the evaluation of its bid. The protestor "pointed to no record evidence of bias. Instead it has merely reiterated its contentions that the Air Force erred in evaluating the proposals. This is not evidence of bias, and it is insuffi-

cient to overcome the presumption that contracting officer acted in good faith." *Info. Tech.*, 316 F.3d at 1323 n. 2. Nor does plaintiff direct the court to evidence in the administrative record tending to show that the Air Force's evaluation of its bid was somehow arbitrary, capricious, an abuse of discretion, or contrary to law. Instead, plaintiff simply contradicts, in sweeping statements, the truth of the statements in the evaluation. None of these points, however, answers for the fact that plaintiff submitted a bid that was incomplete in several important areas. Based on this administrative record, there is no basis for the court to determine that the defendant's evaluation of the plaintiff's proposal was arbitrary, capricious, or an abuse of discretion. *See Info. Tech.*, 316 F.3d at 1323.

**c. Did the Evaluation Result in Prejudice?**

Had there actually been any errors in the procurement process, this court would next have had to determine whether those errors prejudiced plaintiff. *Bannum*, 404 F.3d at 1353; *Alfa Laval Separation, Inc. v. United States*, 175 F.3d 1365, 1367 (Fed.Cir.1999). To establish prejudice, the plaintiff would have to show there was a substantial chance that it would have received the contract but for the errors in evaluating its proposal. *Bannum*, 404 F.3d at 1353; *Info. Tech.*, 316 F.3d at 1319; *Alfa Laval*, 175 F.3d at 1367. In this case, since defendant's evaluation of NVC's proposal was not arbitrary and capricious, there were no errors that could have prejudiced plaintiff. It is therefore unnecessary to engage in a full review of the facts for the merits of prejudice. *See Info. Tech.*, 316 F.3d at 1323 (not engaging in review of the merits for prejudice, because no errors were found in the contracting process).

**2. Was the Evaluation of Insight's Proposal Arbitrary and Capricious?**

■ The second line of reasoning plaintiff advances for its bid protest is that Insight was unqualified to receive the award and that the evaluation of Insight's proposal was therefore arbitrary and capricious. Pl. Am. Compl. ¶¶ 115–117. In this instance, the

facts in the administrative record indicate that plaintiff does not have standing to assert this claim and the court will not consider it.

As mentioned, standing is a predicate issue this court considers in a bid protest. *Info. Tech.*, 316 F.3d at 1319; *Myers*, 275 F.3d at 1369. For standing there must be prejudice, in the sense that there must be a showing there was a substantial chance the protestor could have received the proposal. The facts in the administrative record indicate that Insight, Litton, and NVC each submitted proposals in response to the PRDA. Insight's proposal was ranked first, Litton's second and NVC's third, as "Category III" ineligible for award. Pl. CSF ¶ 10. Under these facts, even assuming plaintiff's arguments were correct and the evaluation of Insight's bid was arbitrary and capricious, Litton would receive the award because it was ranked second in the competition.

There is no argument on the behalf of the plaintiff and no evidence presented that Litton's ranking itself was arbitrary and capricious. Plaintiff does point out that in the record the technical evaluation committee noted that: "[Litton's] proposal provided only limited information on the design approach they plan to pursue and this makes it difficult to fully assess the amount of risk with their effort." AR Ex. 96 at 968. Plaintiff's argument is not that Litton's ranking was incorrect, but rather that NVC should have been ranked higher than Litton. Having determined that the evaluation of NVC's proposal was not arbitrary and capricious, and with no allegation that Litton's ranking was inappropriate, this court has no reason to conclude that Litton's second place ranking was improper.

As a result, plaintiff has not established that it has standing to challenge the evaluation of Insight's proposal as arbitrary and capricious. Plaintiff cannot show it had a substantial chance to receive the bid, since Litton was ranked second and was next in line to receive the bid. Without a substantial chance to receive the award, plaintiff lacks standing to proceed with this claim. *See Int'l Bus. Machs. Corp.*, 892 F.2d 1006 (find-

ing no standing because a bidder was rated below second place, and assuming the bid protest was successful, the award would go to another party); *Greenleaf Constr. Co. v. United States*, 67 Fed.Cl. 350, 362 (2005) (denying standing since a party "may only posit arguments that demonstrate that, but for the government's alleged breach, it would have had a substantial chance at winning the award").

Since the evaluation of NVC's proposal was not arbitrary and capricious and since plaintiff has no standing to challenge the evaluation of Insight's bid, defendant's motion for judgment on the administrative record is granted.

## IV. Conclusion

For all of the foregoing reasons, plaintiff's motion for partial summary judgment on counts I, II and IV is **DENIED**, defendant's motion for summary judgment on counts I and III is **GRANTED**, defendant's motion to dismiss counts II and IV is **GRANTED**, and defendant's motion for judgment on the administrative record on count V is **GRANTED**.

**JUDGMENT** for Defendant.

**IT IS SO ORDERED.**